455 F.2d 1306
 147 U.S.App.D.C. 238
 The WHEELABRATOR CORPORATION
v.
John H. CHAFEE, Secretary of the Navy, et al., Appellants.
The WHEELABRATOR CORPORATION
v.
John H. CHAFEE, Secretary of the Navy, et al., The
Carborundum Company, Appellant.
 Nos. 24705, 24729.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 15, 1971.
Judgment Jan. 26, 1971.
Opinion Oct. 14, 1971.
 
 Mr. Walter H. Fleischer, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for appellant Chafee in No. 24,705. Messrs. Morton Hollander, Atty., Department of Justice, and John A. Terry and Robert M. Werdig, Jr., Asst. U. S. Attys., also entered appearances for appellant Chafee in No. 24,705.
 Mr. David E. McGiffert, Washington, D. C., for appellant in No. 24,729.
 Mr. Daniel A. Rezneck, Washington, D. C., with whom Mr. James A. Dobkin, Washington, D. C., was on the brief, for appellee.
 Before FAHY, Senior Circuit Judge, and LEVENTHAL and MacKINNON, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This is an appeal from a preliminary injunction restraining Navy officials from opening any bid, awarding any contract, or in any other way carrying out a Solicitation for a portable ship hull cleaning device. On January 26, 1971, we entered our judgment of reversal, stating that "the complaint, motion, and affidavits filed by the plaintiff do not show sufficient likelihood of success on the merits * * * to warrant grant of the injunctive relief prayed." This opinion, which explains our reasoning, is being issued simultaneously with the opinion in Steinthal v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289 which involves related considerations.
 
 I. THE FACTS AND DISTRICT COURT PROCEEDINGS
 
 2
 On April 22, 1970, defendant officials initiated a procurement pursuant to a solicitation for a self-contained, portable, blast-cleaning apparatus for cleaning the hull sides of ships. The District Court found that plaintiff Wheelabrator had developed a new and unique device, never previously purchased by the United States Government, as a result of a twelve-year research and development effort, on which plaintiffs allegedly spent over $100,000, that included demonstrations and consultation with Navy personnel. Plaintiff alleged that it thus acquired "a body of technology, special equipment and tooling, all of which uniquely qualifies plaintiff to manufacture the portable ship hull cleaner for the Navy and avoid the undue delay and expense which would arise from a new supplier having to acquire such technique, technology, tooling and equipment."
 
 
 3
 The essence of the complaint is that under Armed Service Procurement Regulations (ASPR) the only lawful method of procurement for this product was by negotiation with plaintiff, and that the Navy acted in violation of ASPR when it proceeded by "Two-Step Formal Advertising,"[1] under which bidders first submit technical proposals without price quotations and then those bidders whose technical proposals are deemed acceptable are invited to submit price bids on the item.
 
 
 4
 Responding to the first step, on June 2, 1970, plaintiff submitted three technical proposals, one of which was deemed acceptable by the Navy.
 
 
 5
 By letter dated July 22, 1970, plaintiff protested to the Comptroller General, head of the General Accounting Office.[2] On August 3, 1970, without awaiting GAO's decision, the Navy proceeded to the second step, and issued a formal invitation for bids under Solicitation No. NOO600-70-B-0478 to plaintiff and to the Pangborn Division of the Carborundum Company-the only other company whose technical proposal was deemed acceptable by the Navy.
 
 
 6
 Objecting to the defendant's continued use of this method of procurement during the pendency of plaintiff's protest before the Comptroller General, plaintiff notified the Navy that it would not submit a bid. Initially, the deadline for the submission of bids and the date for opening bids was August 18, 1970, the District Court issued a temporary restraining order enjoining defendants from opening bids and awarding a contract. The deadline for the submission and opening of bids was extended by the Navy to August 31, 1970.
 
 
 7
 In support of its preliminary injunction entered August 31, 1970, 319 F.Supp. 87, the District Court found that the award of the contract to Carborundum would result in irreparable injury to plaintiff through loss of investment, waste of acquired skill and expertise, and abridgment of the right to a meaningful decision by the Comptroller General. It might also "deprive the Department of the Navy of the benefits of plaintiff's technical skill and know-how derived from its development of this product over the past twelve years." The court concluded there was a substantial likelihood that plaintiff would establish the unlawfulness of defendants' action in procuring the portable ship hull cleaner pursuant to the method of "two-step formal advertising."
 
 II. APPLICABLE LEGAL DOCTRINES
 A. Plaintiff's Claims of Illegality
 
 8
 In Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970), we held a bidder for a government contract who, like plaintiff in this case, alleged illegality in the manner by which a contract is awarded has standing to seek judicial review of the procurement agency's action.
 
 
 9
 In this case, however, plaintiff has failed to make out a prima facie case of illegality on the part of the procurement officials. Plaintiff's claims must be evaluated in the light of the applicable statute, the Armed Services Procurement Act, 10 U.S.C. Sec. 2301 et seq., and regulations, see ASPR; 32 C.F.R. Secs. 2-501 et seq. (1970).
 
 
 10
 Wheelabrator's first claim is that the use of two-step formal advertising is forbidden by ASPR 2-502, which provides:
 
 
 11
 (a) Two-step formal advertising shall be used in preference to negotiation when all of the following conditions are present, unless other factors require the use of negotiations, e. g., Sec. 3.213 of this chapter;
 
 
 12
 (1) Available specifications or purchase descriptions are not sufficiently definite or complete or may be too restrictive, and the listing of the salient characteristics in a "brand name or equal" description would likewise be too restrictive, to permit full and free competition without technical evaluation, and any necessary discussion, of the technical aspects of the requirement to insure mutual understanding between each source and the Government;
 
 
 13
 (2) Definite criteria exist for evaluating technical proposals, such as design, manufacturing, testing, and performance requirements, and special requirements for operational suitability and ease of maintenance;
 
 
 14
 (3) More than one technically qualified source is expected to be available;
 
 
 15
 (4) Sufficient time will be available for use of the two-step method; and
 
 
 16
 (5) A firm fixed-price contract or a fixed-price contract with escalation will be used.
 
 
 17
 (b) None of the following in itself precludes the use of two-step formal advertising:
 
 
 18
 (1) A multi-year procurement is being made.
 
 
 19
 (2) A first or subsequent production quantity is being procured under a performance specification.
 
 
 20
 Wheelabrator's complaint maintained that ASPR Sec. 2-502(a) permits the use of two-step formal advertising in preference to negotiation only if a number of enumerated conditions are present, and that in this case the "requirement" of both (2) and (3) were absent.
 
 
 21
 Wheelabrator's second claim of illegality was based on Sec. 4(a) (14) of the Armed Services Procurement Act, 10 U.S.C. Sec. 2304(a) (14) and ASPR Sec. 3-214.1, under which it claims that "negotiation rather than two-step formal advertising is required." These sections provide for negotiation when:
 
 
 22
 formal advertising would be likely to result in additional cost to the Government by reason of duplication of investment or would result in duplication of necessary preparation which would unduly delay the procurement of the property.
 
 
 23
 In our opinion, Wheelabrator misconstrues the meaning and intent of the statute and regulations. They are permissive, authorizing a possibility of negotiation, not requiring it in this situation. Where government officials act within the limits of the discretion conferred upon them by Congress, there is no arbitrary and capricious action which the courts have the power to enjoin.B. Armed Services Procurement Act
 
 
 24
 The statute reveals a Congressional preference for competitive bidding. It provides, 10 U.S.C. Sec. 2304(a):
 
 
 25
 (a) Purchases of and contracts for property or services covered by this chapter shall be made by formal advertising in all cases in which the use of such method is feasible and practicable under the existing conditions and circumstances. If use of such method is not feasible and practicable, the head of an agency, subject to the requirements for determinations and findings in section 2310, may negotiate such a purchase or contract, if-
 
 
 26
 ******
 
 
 27
 * * *
 
 
 28
 (14) the purchase or contract is for technical or special property that he determines to require a substantial initial investment or an extended period of preparation for manufacture, and for which he determines that formal advertising would be likely to result in additional cost to the Government by reason of duplication of investment or would result in duplication of necessary preparation which would unduly delay the procurement of the property * * *.
 
 
 29
 The law provides only that the agency head "may" use negotiation under certain conditions. The preference for active competition and formal advertising mandated by the statute is carried forward by the Regulations issued thereunder. Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). See ASPR Sec. 1-300. Congress intended "that the military departments use formal advertising in all procurements in which this method could reasonably be expected to give satisfactory results although circumstances might exist that would be sufficient to authorize negotiation under one or more of the 17 exceptions" listed in 10 U.S.C. Sec. 2304(a). S.Rep. No. 1884, 87th Cong., 2d Sess. 2 (1962) U.S.Code Cong. & Admin.News 1962, p. 2476. See also ASPR Sec. 2-102.1(a), which carries forward the Congressional mandate to resolve doubts in favor of formal advertising even where negotiation might also be permissible. Wheelabrator failed to make a showing that negotiation was mandatory on the facts of this case.
 
 C. ASPR Sec. 2-502
 
 30
 This regulation, set forth above, provides that two-step formal advertising "shall" be used where all five conditions listed are present. We note that the regulation does not say that the two-step method is barred if any one of the five conditions is not met. However, we need not define the legal significance of this circumstance. For in the case before us the two conditions of Sec. 2-502(a) alleged by Wheelabrator to be absent were found by the Contracting Officer to be fulfilled.
 
 
 31
 The condition listed under subparagraph (3) of Sec. 2-502(a) is that "Definite criteria exist for evaluating technical proposals * * *" The Navy's April 22, 1970, solicitation included a twenty-page "Purchase Description" setting forth in detail the characteristics of the desired equipment. The Navy announced that it expected "complete conformance with the Purchase Description" for a bid to be considered acceptable. It is true that in part the specifications are written in terms of desired performance, which gives the Navy greater latitude in its evaluation. But "performance requirements" are part of the "definite criteria" listed in Sec. 2-502(a), and Sec. 2-502(b) (2) clearly states that procurement under a performance specification does not in itself preclude the use of two-step formal advertising.
 
 
 32
 Wheelabrator also referred to subparagraph (3) of Sec. 2-502(a) and its condition that "[m]ore than one technically qualified source is expected to be available." The Navy, which solicited 37 firms, obviously "expected" more than one technically qualified source. The District Judge made no finding that the Navy could not reasonably expect more than one source. Wheelabrator does not dispute that the technical proposal submitted by intervenor Carborundum was acceptable.
 
 
 33
 Wheelabrator claims it made a prima facie showing by submitting affidavits of two of its officials, alleging the absence of the definite criteria and multiple source conditions. It contends that since no affidavits in rebuttal were submitted by the Government, the District Court was justified in granting the preliminary injunction. But these allegations-that Wheelabrator is "uniquely" qualified and that the specifications were inadequate-must be seen for what they are, "opinion based in great part on conjecture or belief." American Standard, Inc. v. Laird, 326 F.Supp. 492 (D.D.C.Feb. 3, 1971). Furthermore, the contrary findings by the contracting officers were on the record.
 
 
 34
 D. ASPR Sec. 3-214-Requirements for Negotiation in Lieu of Advertising
 
 
 35
 Wheelabrator's second prong relies on ASPR Sec. 3-214, which tracks the language of 10 U.S.C. Sec. 2304(a) (14), set forth above.
 
 
 36
 The head of an agency has authority to use negotiation instead of advertising pursuant to a determination under Sec. 2304 (a) (14). Such determination must "be based on a written finding by the person making the determination or decision, which finding shall set out facts and circumstances that (1) are clearly illustrative of the conditions described in [clause 14]." 10 U.S.C. Sec. 2310(b) (Supp. V 1970). The statute also provides, "Such a finding is final. * * *" Id.
 
 
 37
 The legislative history of Sec. 2310 indicates that Congress intended to prevent review of determinations to negotiate under Sec. 2304(a) by either the Comptroller General or the courts.[3] We need not consider in this case the existence or extent of a court's jurisdiction in the event that the department head makes a determination to negotiate, under 10 U.S.C. Sec. 2304(a) (14), and his action is attacked as illegal. We are clear that the court cannot order a department head, here the Secretary of the Navy, to make the discretionary determinations permitted by 10 U.S.C. Sec. 2304(a) (14). His decision not to make that determination is an exercise of discretion which Congress committed solely to the discretion of the head of the agency, and which is not reviewable in court. See generally, Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1968).
 
 
 38
 The foregoing establishes the need for reversal. We need not consider in this case whether this analysis slams the door to the courthouse airtight, or whether it may be opened for a peek in limited cases,-e. g., where there is a claim that the court's general lack of review authority is subject to an exception because of extrinsic facts, such as fraud or bribery, that undercuts any bona fide defense that the matter rests solely within the Secretary's discretion. Perhaps by analogy to rulings made in other instances where the court is generally without jurisdiction of a challenge to official action there is a limited exception if the pleading papers establish on their face, without any burrowing into the administrative file, that the agency action violates a clear command of the governing law, and that no state of facts may reasonably be conceived that would justify the administrative action. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); Municipal Light Boards v. FPC, 146 U.S.App.D.C. 294, 450 F.2d 1341 (1971); Int'l Ass'n of Mach. & Aerospace Workers v. Nat'l Mediation Bd., 138 U.S.App.D.C. 96, 105, 425 F.2d 527, 536 (1970); Int'l Bro. of Teamsters v. Brotherhood of Ry., A. & S. Clerks, 131 U.S.App.D.C. 55, 64, 402 F.2d 196, 205, cert. denied sub nom. Brotherhood of Ry. A. & S. Clerks etc. v. National Mediation Board, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968); Long Island R. Co. v. United States, 193 F.Supp. 795, 800 (3-judge court, E.D.N.Y.1961). Since no such exceptional showing has been made in this case,-and indeed plaintiff assumes that the court's reviewing authority includes calling on the procurement officials to state the reasons in court-we need not consider whether or to what extent exceptional circumstances may provide a limited jurisdiction.
 
 
 39
 However, because the doctrine we set forth today was not before the trial judge we take the extra step in this case of noting that even if we had provided the more conventional judicial review, with latitude to vacate an order for abuse of discretion, we conclude that no abuse of discretion has been shown. The regulations applicable to the use of the clause 14 negotiation authority pose certain requirements, see ASPR Sec. 3.214-3:
 
 
 40
 The authority of this section and Secs. 3.214-3.214-2 shall not be used unless and until the Secretary has determined, in accordance with the requirements of Subpart C of this part, that:
 
 
 41
 (a) The supplies are of a technical or special nature requiring a substantial initial investment or an extended period of preparation for manufacture; and
 
 
 42
 (b) Procurement by formal advertising either:
 
 
 43
 (1) Would be likely to result in additional cost to the Government by reason of duplication of investment, or
 
 
 44
 (2) Would result in duplication of necessary preparation which would unduly delay the procurement.
 
 
 45
 The pertinent regulations[4] appear to address themselves to major procurements like aircraft, tanks, missiles.[5]
 
 
 46
 Certainly it is the pressure of large defense and related equipment requirements since World War II that has led to the condition where the bulk of procurement, in dollar terms, is accounted for by negotiation rather than formal advertising,[6] although the extent of negotiation procurement must in turn be qualified to take account of the extent and effect of efforts to inject competitive techniques into a substantial value of negotiation procurement.
 
 
 47
 We are not called upon to consider, however, whether Wheelabrator's claim falls because of the nature of the item under procurement. It suffices that Wheelabrator's claim insofar as it relies on ASPR Sec. 3-214 founders on its inability to demonstrate, to the degree required for a claim of abuse of discretion, that formal advertising procurement would be likely to result either in additional cost to the Government by reason of duplication of investment (the Government has not yet invested any money in this project) or "in duplication of necessary preparation which would unduly delay the procurement."
 
 
 48
 We have doubt whether Wheelabrator's affidavits convincingly demonstrate that "the technical or special nature" of the supplies required a "substantial" initial investment within the meaning of the regulation.
 
 
 49
 III. STANDARDS OF JUDICIAL SCRUTINY OF PROCUREMENT DECISIONS
 
 
 50
 In considering the propriety of the preliminary injunction issued by the District Court, we begin by taking note that the bid protest was still under consideration by the General Accounting Office.
 
 
 51
 This is a consideration not without materiality. The Comptroller General has issued Bid Protest Procedures, 4 C.F.R. Part 20, which provide that in case of an award or proposed award involving an agency of the Federal Government whose accounts are subject to settlement by the General Accounting Office an interested party may challenge an award or proposed award and obtain a ruling as to its propriety under the applicable law and regulations. The Comptroller General does not claim that his action operates as a legal or judicial determination of the rights of the parties. A primary basis of his action is his function of settling a public account, see 31 U.S.C. Secs. 71, 74, with a decision constituting a General Accounting Office indication of what it deems required of a procurement official in order to clear a public account. See discussion of Judge Holtzoff in U. S. ex rel. Brookfield Construction Co. v. Stewart, D.C., 234 F.Supp. 94, aff'd 119 U.S.App.D.C. 254, 339 F.2d 753 (1964). We are not required to determine the issue of the extent of the authority of the GAO which may be inferred from the function of settling accounts or other responsibilities.[7]
 
 
 52
 Whatever the exact range of its authority the history of the GAO, now a mature 50 years of age, reflects an increasing recourse to the GAO for bid protest rulings. The certifying or disbursing officers may seek the advantage of an estoppel against future GAO questioning of payments. As for the bidder the GAO was viewed for years as the sole forum "filling the vacuum left by judicial abandonment of the contract formation process."[8]
 
 
 53
 The GAO has established a corps of officials concerned with compliance by procurement officials with provisions of applicable statutes and regulations. Its rulings provide review by an agency that is independent of the executive departments engaged in the procurement.[9] The volume of its bid protest business has been substantial,[10] and while the proportion of rulings recommending cancellations of executed contracts is small, there is a not insignificant record of "corrective action" required by the GAO, in addition to corrective action stimulated within the Executive Departments to obviate future recurrence of the problems.[11]
 
 
 54
 The importance of the GAO has not been undercut by the recognition of a judicial forum for disappointed bidders that culminated in our Scanwell opinion on February 13, 1970. Indeed, in the period since that time there has been increasing resort by disappointed bidders to GAO,[12] notwithstanding Scanwell's declaration that exhaustion of the GAO remedy was not required where futile. This presumably reflects the consideration that the GAO procedure is more informal, inexpensive and expeditious,[13] and has been revised, in response to the prodding of the House Government Operations Committee, and industry-Government symposiums, to enlarge the procedural rights of the bidder engaged in the protest. In 1968, after according opportunity for comment, the GAO published regulations on procedures for handling bid protests.[14] Resort to the GAO persists, notwithstanding assertions that it is excessively oriented to the position of the contracting officer.[15]
 
 
 55
 Plaintiff's application to the GAO in June did not preclude its subsequent application to the District Court, while the matter was still pending in GAO, for injunctive relief to prevent irreparable injury from the imminent bid opening. Under the doctrine of primary jurisdiction, a court may entertain an action for permanent relief and defer its consideration of the merits until an agency "with special competence" in the field has ruled on the issues, if necessary maintaining the status quo pendente lite with injunctive relief avoiding irreparable injury pending such agency consideration. Brawner Building, Inc. v. Shehyn, 143 U.S.App.D.C. 125, 442 F.2d 847 (Feb. 23, 1971).[16] This doctrine has application to the General Accounting Office even assuming that its function is advisory since it has the special competence and experience that is the life and reason of the primary jurisdiction rule. Best v. Humboldt Placer Mining Co., 371 U.S. 334, 338, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); United States v. Western Pac. R. Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The court has the last word, but it can properly seek the benefit of whatever contributions can be made by an agency whose "area of specialization" embraces problems similar to or intermeshed with those presented to the court. 3 K. Davis, Administrative Law Treatise Sec. 19.09 at 53 (1958).
 
 
 56
 The preliminary injunction by a court pending GAO determinations may provide a felicitous blending of remedies and mutual reinforcement of forums, since even the relatively expeditious GAO (fn. 13) may run into delays on decisions that undercut effectiveness of relief (see fn. 11). The preliminary injunction may be used to preserve the status quo and while securing for the court the benefit of the GAO's expertise. Where a court has warrant for issuing an injunction pending GAO determination it may be able to obviate the objection sometimes leveled at GAO's procedure, that the time required sometimes renders the matter moot prior to GAO's determination.
 
 
 57
 In considering whether to extend a preliminary injunction, or issue a permanent injunction, against a procurement determination the court may properly take into account the GAO's concurrence in the executive determination, although the court does have the last word and should not shrink from exercise of its power when the conditions justify an injunction. Steinthal v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289, decided this day.
 
 
 58
 However, the present injunction, though issued prior to the GAO action on the bid protest, was not limited in duration so as to prevent such consideration. But it may not be supposed that a preliminary injunction is appropriate merely because the matter is pending before the GAO, or will be brought before the GAO at the court's insistence, by analogy to the procedure followed in Brawner v. Shehyn, supra. Whether a preliminary injunction should be granted pendente lite, is a separate question from whether the primary jurisdiction doctrine should be invoked, though the issues are often inter-related. In view of the public interest in expeditious procurement a preliminary injunction cannot be justified unless the court makes a considered judgment of a probability of success on the merits. Likelihood of success is a requirement of an injunction even though the court's probing and analysis may not be as comprehensive when its injunction is limited to the period required for a determination by the GAO on the protest.
 
 
 59
 In the present case, the issuance of the preliminary injunction, which was not limited to the period of GAO consideration, was on a basis that we consider erroneous, and the preliminary injunction must be terminated. The administrative procurement decisions here attacked as illegal were consistent with the nation's general policy favoring advertised competition, clearly expressed in the pertinent statutes and regulations. Judicial scrutiny of actions taken under the Armed Services Procurement Act should be oriented to the purpose of furthering open competitive bidding and contract award. A. G. Schoonmaker Co. v. Resor, 144 U.S.App.D.C. 250, 445 F.2d 726 (June 4, 1971). A court reviewing administrative action with an eye to assuring compliance with statutory mandates and policies should not take action that would avoid advertising in this area without a clear-cut statutory mandate. Steinthal v. Seamans, supra.
 
 
 60
 In the particular case, involving a failure of the agency head to make the negotiation determination permitted by 10 U.S.C. Sec. 2304(a) (14), we have an action, or more strictly a failure to take action, that is "committed to agency discretion by law" within the meaning of the Administrative Procedure Act, 5 U.S.C. Sec. 701(a) (2) (1970).
 
 
 61
 Reversed.
 
 
 
 [1]
 This method of procurement is provided for by ASPR Sec. 2-501 et seq
 
 
 [2]
 Plaintiff's protest was denied by the Comptroller General on November 9, 1970
 
 
 [3]
 During debate on the 1962 proposed amendments to the Armed Services Procurement Act of 1947, the House adopted an amendment which would have modified 10 U.S.C. Sec. 2310(a) to read: "Such a determination is final, unless the same is clearly erroneous or is not supported by substantial evidence." 108 Cong.Rec. 9242-43 (daily ed., June 7, 1962) [87th Cong., 2d Sess.]. (Language in italics added by the House amendment.) The amendment was designed to give the Comptroller General the same authority to review the determination in question that he had with respect to advertised procurements. Id. at 9242. When the bill reached the Senate, the Department of Defense objected to the language inserted by the House on the ground that it would permit the determinations "to be overruled by an agency outside the Department of Defense or even possibly by a court" and that this was unwise since the determinations involved judgment factors not involved in formally advertised procurements. Subcomm. on Procurement Practices, etc., of the Senate Comm. on Armed Services, S.Rep.No. 1884, 87th Cong., 2d Sess. 11 (1962). The Senate Committee omitted the added language from the bill as reported and the Senate adopted the Committee-recommended bill. 108 Cong.Rec. 16852-53 (daily ed., June 7, 1962) [87th Cong., 2d Sess.]. The House, on recommendation of Mr. Vinson, the Chairman of the House Armed Services Committee, adopted the Senate version. Id. at 16852-53. Mr. Vinson noted his regret at the Senate's failure to accept the House amendment, stating that "The Senate Committee members expressed concern over the possibility of interference with the executive authority by transferring some of this authority to another branch of the Government." Id. at 16853
 
 
 [4]
 ASPR Sec. 3.214-2 provides:
 Sec. 3.214-2 Application.
 The authority of Sec. 3.214 may be used for procurement of technical or specialized supplies-for example: aircraft, tanks, radar, guided missiles, rockets, and similar items of equipment; major components of any of the foregoing; and any supplies of a technical or specialized nature which may be necessary for the use or operation of any of the foregoing. Such procurement generally involves:
 (a) High starting costs which already have been paid for by the Government or by the supplier;
 (b) Preliminary engineering and development work that would not be useful to or usable by any other supplier;
 (c) Elaborate special tooling already acquired;
 (d) Substantial time and effort already expended in developing a prototype or an initial production model; and
 (e) Important design changes which will continue to be developed by the supplier.
 The authority of Sec. 3.214 will in general be used in situations where it is preferable to place a production contract with the supplier who had developed the equipment, and thereby either assure to the Government the benefit of the techniques, tooling, and equipment already acquired by that supplier, or avoid undue delay arising from a new supplier having to acquire such techniques, tooling and equipment.
 However, this exception should not be used to avoid duplication of private investment unless this duplication would be likely to result in additional cost to the Government.
 (Emphasis supplied.)
 
 
 [5]
 Testimony of the Comptroller General of the United States, Hearings on A Study of the Military Procurement Policies, etc., Before the Procurement Subcommittee of the Senate Committee on Armed Services, 86th Cong., 2d Sess. 150 (1960):
 Section 2304(a) (14) of the Armed Services Procurement Act authorizes negotiation on a sole-source basis where it is determined that manufacture of the supplies will require a substantial initial investment and that use of formal advertising might require duplication of such investment. The legislative history indicates that the authority in exception 14 was considered necessary because adherence to formal advertising procedures in the procurement of aircraft, missiles, etc., would consistently result in the United States being 1 to 2 years behind latest developments. * * *
 
 
 [6]
 In fiscal year 1970, for example, negotiation methods were used for 86.2% of the military procurement dollars spent, with formal advertising accounting for only 13.8%. However, about 43% of the procurement dollar was placed under competitive techniques. Address by Paul G. Dembling, General Counsel, General Accounting Office, before the American Bar Association, London, July 14, 1971, United States Government Contract Formation at p. 6 (mimeo)
 
 
 [7]
 This question has given rise to some discussion, e. g., Cibinic and Lasken, The Comptroller General and Government Contracts, 38 Geo.Wash.L.Rev. 349, at 351-384 (1970). The question is of no moment for present purposes, for it is common ground first, that an outside contractor or party is not bound by an adverse ruling of the GAO, but may, e. g., ultimately pursue his damage remedies, and second, that an advance GAO ruling approving a payment binds the GAO not to take a different position later in any controversy with the official
 
 
 [8]
 Cibinic and Lasken, supra note 7, at 351
 
 
 [9]
 The Comptroller General is appointed for a term of 15 years, cannot succeed himself and cannot be removed except for cause by joint resolution of Congress. The Comptroller General and the GAO were declared to be part of the legislative branch by reorganization acts passed in 1945 and 1949, see 5 U.S.C. Sec. 902(1). The Comptroller General was named as agent of Congress by the Accounting and Auditing Act of 1950, 31 U.S.C. Sec. 65 (1964)
 
 
 [10]
 
 BID PROTEST CASES HANDLED BY GAO
 Year Formal Protests Protests Contract Corrective
 Decisions Denied Sustained Cancellation Action
 Rendered Recommended Recommended
Fiscal
 1971 715 641 74 4 85
 1970 583 548 35 5 65
 1969 554 520 34 8 73
 Cal.
 1968 569 539 30 2 71
 1967 206 189 17 6 42
 Data for fiscal 1969 and 1970 derived from the Annual Reports of the Comptroller General for 1969 (p. 255) and 1970 (p. 111). Data for 1968 derived from Hearings, House Government Operations Committee on H.R. 474, p. 743, 91st Cong., 1st Sess. Data for 1967 derived from Hearings, Senate Select Committee on Small Business, February 6, 7 and April 2, 3, 1968, p. 237, 90th Cong., 2d Sess. (Represents statistics for period July thru December 1967). Data for fiscal 1971 derived from Paul G. Dembling, Bid Protest Techniques, address before the National Contract Management Association, Washington, D. C., September 1971.
 
 
 [11]
 The Comptroller General's 1970 Report notes that while the bid protest forum permits questioning of void and voidable contracts "the kind of remedial action presents difficult determinations depending on the advancement of the contract performance and the liability of the Government." One possibility is recommendation of termination of the contract for the Government's convenience
 The address of General Counsel Dembling, supra note 10, states: In a protest decided before award, the GAO will prohibit an award if it concludes that the action proposed by the contracting officer does not comply with procurement laws and regulations. Where the decision is rendered after award, the GAO exercises discretion whether to require cancellation of the award. He amplifies:
 It may (and frequently does) decide that, although the award was contrary to the rules, full performance under the awarded contract is nevertheless in the best interests of the Government. Such a decision is considered to be justified by the Government's need to obtain prompt performance; the extent to which the contract has already been performed; and similar considerations. In such a case the protester ends up with a moral victory only.
 That GAO is aware of the criticism that its decisions come too late to be effective is evident from its proposed revision of the time frame for submissions and decisions, and proposal for withholding of an award pending GAO ruling unless precluded by the urgency of the procurement. See Notice of Proposed Rule-making, Bid Protest Procedures, 4 CFR Secs. 20.2, 20.4, 20.9; Fed. Reg., April 29, 1971, pp. 8060-61.
 The 1969 Annual Report of the Comptroller General states (p. 255):
 In 73 cases we wrote to the procurement activity suggesting corrective action to avoid recurrence of the deficiencies disclosed in our considerations. A considerable number of these recommendations dealt with need for the Government to state its requirements more precisely and to establish more clearly the criteria to be followed in evaluating proposals and offers.
 In addition to actions resulting from our decisions, corrective measures are often taken by the procuring activity after receipt of a request from our Office for an administrative report which results in withdrawal by many bidders of the protests filed with us.
 The Comptroller General puts it in his 1970 Annual Report (p. 111) that many of the contract decisions "establish guidelines" for procurement agencies and potential contractors. The decisions considered of greatest general interest and significance are published in "Decisions of the Comptroller General of the U. S." The public may have access to copies of unpublished decisions through GAO's Legal Reference Service, which also maintains card-digests with a subject-matter index.
 
 
 [12]
 The data reported by General Counsel Dembling (supra note 10) show 1054 cases received in fiscal year 1971, compared with 771 in fiscal year 1970. A substantial percentage is withdrawn. The 715 formal decisions rendered during fiscal 1971, represent a substantial increase from the magnitude, between 500-600, prevailing in recent prior years
 
 
 [13]
 Cibinic and Lasken, supra note 8, at 364, J. Pois, Watchdog on the Potomac 522-524 (1971) (available pending publication in mimeograph form at Univ. of Pittsburgh)
 
 
 [14]
 33 F.R. 1288. See Title 4, part 20, of Code of Federal Regulations. A protest may be filed by an "interested party,"-a term considered to embrace one whose economic interest may be affected to some extent in the procurement, including e. g., a person who did not submit a bid because he considered the specifications too restrictive; a possible supplier; an association of companies; or a labor union whose members may be affected. Dembling, supra note 10
 
 
 [15]
 Cibinic and Lasken, supra note 7, at e. g., 350, 369, 372. These authors rely, inter alia, on the restrictiveness of the GAO's doctrine accepting the agency's determination on all disputed issues of fact. Id. at 372. However, in its Scanwell opinion the GAO put it that it would not substitute its determination on a question of fact unless here were clear and convincing evidence of error-a standard much the same as that which a court would apply in reviewing administrative determinations. General Counsel Dembling states (supra note 10):
 For the most part, the GAO does not have independent means of deciding disputed issues of fact. Consequently it generally adopts the contracting agency's version of disputed facts unless contrary facts can clearly be shown.
 Cibinic and Lasken also claim that on broad issues the Comptroller General has injected himself into matters of policy properly within the discretion of the procurement officials, and not limited himself to questions of compliance with laws and regulations. Id. at 379, 380. See also J. Pois, supra note 13, at 488 et seq., for a discussion of this problem (as posed by the Philadelphia Plan controversy).
 The 1969 Annual Report of the Comptroller General refers to the problem for bid protest cases of the reliance to be placed on administrative reports obtained to establish the position of the contracting agency on the facts and law. See p. 255:
 We have recognized a need for independent and objective review of agency reports in some cases, and in February of 1969 internal instructions were issued to provide for such review by our audit divisions where necessary.
 
 
 [16]
 In view of our citation of Brawner Building v. Shehyn, we interpose the caution that in this opinion we are not required to determine to what extent the District Court must await a GAO determination. Sometimes, as was pointed out in Scanwell, resort to the GAO should not be required because futile