**WILMINGTON EDUCATION ASSOCIATION and Thomas A. Mitchell, Individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**The BOARD OF PUBLIC EDUCATION IN WILMINGTON et al., Defendants.**

**Civ. A. No. 4447.**

United States District Court, D. Delaware.

Jan. 31, 1975.

John S. Grady, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiffs.

Christine M. Harker, Asst. City Sol., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

The plaintiffs in this case are Thomas Mitchell, a certificated teacher in the Wilmington Public Schools, and the Wilmington Education Association, a union of teachers in that school system. The defendants are the Wilmington Board of Public Education and its individual members. Plaintiffs instituted this suit in August 1972 as a class action on behalf of all teachers employed by the defendant Board during the school year 1971–1972,[1] seeking payment of a salary increase allegedly authorized for that year but withheld because of the "wage freeze" imposed by the President under the Economic Stabilization Act of 1970.[2]

Prior to bringing suit, plaintiff Association had applied to the Internal Revenue Service for a determination of the teachers' entitlement to this pay, but had not succeeded in obtaining any decision from that agency. When defendants raised the failure to secure such a determination as a bar to this suit, the Court found that "[p]rimary jurisdiction to make the determination called for . . . resides in the administrative agency." Wilmington Education Association v. Board of Education in Wilmington, 372 F.Supp. 842, 845 (D. Del.1974). Accordingly, the action was stayed while plaintiffs sought to obtain such a determination.

Within a few weeks of this Court's decision of February 25, 1974, plaintiffs sent to the Office of Wage Stabilization of the Cost of Living Council[3] copies of

1. On January 22, 1973, the Court determined that this action was properly brought as a class action and that plaintiff properly represented the class described in the complaint.

2. 84 Stat. 799, as then amended by 84 Stat. 1468 (1970); 85 Stat. 13 (1971); 85 Stat. 38 (1971); 85 Stat. 743 (1971), and as since amended by 87 Stat. 27 (1973), all set out as a note under 12 U.S.C.A. § 1904 (Supp.1974).

3. The Cost of Living Council had theretofore informed the Court by letter of December 18, 1973, that it had inherited the duties of the IRS in this area under "Phase III" of the Economic Stabilization Program. See 372 F.Supp., at 844 n. 1. This was apparently done by Executive Order No. 11695, § 2(a), 38 Fed.Reg. 1473 (Jan. 11, 1973).

its complaint, the Court's opinion, and other relevant papers from the file of this case. They were then informed that a Form PB–3 "Application for General Wage, Salary and Benefit Adjustments" had to be completed. On April 16, 1974, pursuant to plaintiffs' request, Mr. Roger W. Stanley, accountant for The Wilmington Public Schools, submitted such an application.[4]

On June 21, 1974, the Public Sector Division of the Cost of Living Council responded to the parties with a letter stating that "the Economic Stabilization Act expired at midnight on April 30, 1974. The Cost of Living Council no longer has the authority to issue and enforce orders and regulations pursuant to that Act. The Council, therefore, will not make a determination on the subject [of] retroactive pay increases for teachers."

While it appears to the Court that the Cost of Living Council could have rendered a determination at any time until June 30, 1974, it seems clear that it now has no authority to do so.[5] Plaintiffs thus find themselves in the position of being unable to obtain the administrative determination which this Court has

held to be a prerequisite to their action here. The question which the Court must therefore now confront on plaintiffs' motion to lift the order staying their action is whether it can assume jurisdiction and decide the merits of this case in the absence of the administrative determination without which, it has previously held, "there is no federal cause of action under the [Economic Stabilization] Act . . . to recover a retroactive wage increase . . . ." 372 F.Supp., at 845.[6]

The controlling consideration in determining the proper answer to this question of statutory interpretation must, of course, be the intent of Congress in establishing the Economic Stabilization plan embodied in the Act of that name. Section 203(c)(3) of that Act, upon which plaintiffs here base their claim, provides that:

> . . . the President shall promptly take such action as may be necessary to *require* the payment of any wage or salary increases (including any insurance or other fringe benefits offered in connection with employment) which have been, or in the absence of this subsection would be, withheld under

4. While it would be an exaggeration to say that Mr. Stanley submitted a "completed" form PB–3, he did attach a memorandum explaining why the industry-oriented form could not be used to portray accurately the fiscal situation of a school system, and enclosed copies of the relevant teachers' contracts and an explanatory memorandum from Mr. Russell Dineen, the Assistant Superintendent for Business Administration.

5. Executive Order No. 11781, 39 Fed.Reg. 15749 (May 1, 1974), which provided for the orderly termination of the Economic Stabilization Program, gave the Chairman of the Cost of Living Council authority to determine any matter pending on April 30, 1974, but this authority was granted only "through June 30, 1974."

6. Defendants urge that, whatever the answer to this question might be in another context, it must be negative in this case because the failure to secure an administrative determination was plaintiffs' own fault. The Court does not agree. Plaintiffs acted with reasonable diligence after this Court's opinion

of February 25, 1974. While they might have pressed the Internal Revenue Service more vigorously for a determination on their original application rather than electing to pursue relief in this Court, they did make a timely and good faith effort to secure action from that agency and no prior case had held that securing an administrative determination was a prerequisite to suit. Indeed, the responsible administrative agencies had taken the opposite view, as the record in this case demonstrates. See letter from William E. Barrett, Stabilization Officer, Internal Revenue Service, Nov. 9, 1973: "The Internal Revenue Service is not authorized to make determinations with regard to *payment* of retroacting wage increases. . . ." (emphasis in original); letter from Jeffrey S. Berlin, Associate General Counsel for Pay, Cost of Living Council, Dec. 18, 1973: "we assume that the factual issue of qualification . . . may be addressed by an appropriate court in the context of employer-employee litigation." See also Brennan Petroleum Co., Inc. v. Pasco Petroleum Co., Inc., 373 F.Supp. 1312, 1315 (D.Ariz.1974).

the authority of this title, if the President determines that—

 (A) such increases were provided for by law or contract prior to August 15, 1971; and

 (B) prices have been advanced, productivity increased, taxes have been raised, appropriations have been made, or funds have otherwise been raised or provided for in order to cover such increases. [Emphasis added].

As noted in this Court's prior opinion, this section is a directive to the President. But it is also apparent that the end which Congress sought to achieve through this provision was that of *assuring* that wage or salary increases which met the specified conditions would be paid. At the present time, when the Executive Branch's statutory authority to perform this task has expired, there is no way to effectuate this Congressional goal other than for this Court to consider the merits of plaintiffs' claim.[7]

Thus the Court is confronted with two Congressional desires—that Section 203 (c)(3) determinations be made, and that they be made administratively— which were perfectly consistent at the time the Economic Stabilization Act was enacted, and at the time of this Court's prior decision in this case, but which have now become mutually contradictory with the demise of the administrative bodies created by the Act. If Congress intended an administrative determination to be required even in these circumstances, then this action must now be dismissed. On the other hand, if the advantages which Congress sought to achieve, or the pitfalls it sought to avoid, by resort to the administrative process are insignificant in the current circumstances, such a dismissal would unnecessarily frustrate the Congressional intent to require payment under the stipulated conditions.

In providing for prior administrative determination of Section 203(c)(3) questions, Congress was presumably seeking to achieve the goals usually asserted to be the advantages of the administrative process: speed, flexibility, expertise, and uniformity in the application of statutory criteria. See Municipal Intervenors Group v. Federal Power Commission, 153 U.S.App.D.C. 373, 473 F.2d 84, 90 (1972); see generally 1 K. Davis, Administrative Law Treatise § 1.05 (1958, Supp.1970); L. Jaffe, Judicial Control of Administrative Action 3–10, 25–27 (1965). With the expiration of the Economic Stabilization Act and the dissolution of the administrative agencies created thereunder, the necessity for speedier and more flexible determinations than a court could render is no longer present. Findings of fact of the kind called for by Section 203(c)(3) are of the sort which courts are accustomed to making; they present no issues "for the adequate appreciation of which acquaintance with many intricate facts [of technical knowledge] is indispensible." Great Northern Ry. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922) (per Brandeis, J.). Finally, the efficient and uniform operation of this complex regulatory scheme can no longer be affected by judicial decisions since the scheme no longer exists. Since the only effect of a decision here will be the determination of purely private rights, there is no longer any reason to refrain from the exercise of judicial jurisdiction.

As noted in its prior opinion, this Court reads the Act to reflect a Congressional scheme based on considerations similar to those that support the doctrines of primary jurisdiction and exhaustion of administrative remedies. Whether the principal reason behind these rules is the courts' consideration

---

7. Of course, this Court's jurisdiction over this suit, if it exists, it also conferred by this same statute (§ 210(a)). However, the statute provides that its expiration "shall not affect any action or pending proceedings, civil or criminal, not finally determined on such [expiration] date, nor any action or proceeding based upon any act committed prior to May 1, 1974." (§ 218).

for agencies' "special competence and expertise," Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 455 F.2d 1306, 1316 (1971), or their "recognition of the need for orderly and sensible co-ordination of [their respective] work," 3 K. Davis, Administrative Law Treatise 5 (1958), the exercise of jurisdiction by this Court in this case at this time cannot impinge on these considerations. There is now no agency to whose expertise the Court can defer or with whose jurisdiction it can coordinate its own.

The Supreme Court has said that "Court jurisdiction is not . . . ousted, but only postponed" by the application of the primary jurisdiction rule. United States v. Philadelphia National Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963). Professor Jaffe argues that "A fortiori there should not be a dismissal (if dismissal would be prejudicial) where the agency is without power to give the relief to which a party may be entitled under the law governing the cause of action." L. Jaffe, Judicial Control of Administrative Action 138 (1965). Finally, in applying the "closely allied," *Id.* at 121, doctrine of exhaustion of administrative remedies to actions brought under the judicial review Section 211(a) of the Economic Stabilization Act, the courts have not hesitated to exercise their jurisdiction when administrative remedies were inadequate. See Air Products and Chemicals, Inc. v. United Gas Pipe Line Co., 503 F.2d 1060, 1063 (Em.App. 1974)·; Consumers Union of United States, Inc. v. Cost of Living Council,

491 F.2d 1396, 1399–1400 (Em.App.), cert. denied, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974); Associated General Contractors of America, Inc. v. Laborers International Union, 476 F.2d 1388, 1403–04 (Em.App.1973); compare American Nursing Home Association v. Cost of Living Council, 497 F.2d 909, 912–13 (Em.App.1974); Anderson v. Dunlop, 485 F.2d 666 (Em.App.1973), cert. denied, 414 U.S. 1113, 94 S.Ct. 871, 38 L.Ed.2d 756 (1974); City of New York v. New York Telephone Co., 468 F.2d 1401, 1406 (Em.App.1972).

■ It is consistent with the analysis of these authorities to conclude that plaintiffs' inability to secure an administrative determination under Section 203(c)(3) should not bar relief on their claim. Since the Court so concludes, the stay will be lifted and the case considered on its merits.

At the time the stay was entered, cross-motions for summary judgment were pending.[8] Since the parties have made their record and submitted briefs on these motions, it is appropriate now to resume consideration of them, as plaintiffs request.

■ In order to prevail, plaintiffs must show under Section 203(c)(3) of the Economic Stabilization Act that the wages to which they believe themselves entitled were "provided for by law or contract prior to August 15, 1971," that funds had been "raised or provided for in order to cover such increases," and that the wages were "withheld under the authority of" the Act.[9] The following

8. Defendants' motion was to dismiss for failure to state a claim which the Court has treated as a motion for summary judgment under F.R.Civ.P. 12(b)(6).

9. Title 6 CFR § 201.36(c) (formerly 6 CFR § 201.15(c)) provides detailed criteria by which to determine the satisfaction of these requirements. Subsection (c) provides, in part:

For purposes of paragraphs (a) and (b) of this section, the factual requirements of paragraph (a) are deemed satisfied with respect to whether—

(1) The amount of a wage and salary increase provided for by law, contract, agreement, or practice was established prior to August 15, 1971, if such amount was determined and definite and if—

(i) A contract was executed, entered into, or became effective prior to August 15, 1971, or

(ii) A pay practice was announced, reduced to writing, placed in effect, or otherwise clearly established prior to August 15, 1971, or

(iii) A law, ordinance, or resolution, or a rule, regulation, or decision of a govern-

undisputed facts show that plaintiffs cannot meet these tests.

Plaintiffs' collective bargaining agreement with the Wilmington Board of Education shows on its face that it was not signed until September 13, 1971. This, then, cannot be the basis for any assertion that a pay raise was provided for prior to August 15 of that year.[10]

Individual teachers' contracts were signed by May 1, 1971 for the 1971–72 school year, but did not specify a salary rate.[11] They did, however, bind the City and the State to pay at least the minimum rate provided for in 14 Del.C. § 1305,[12] which, by law approved prior to August 15, 1971, included a 5% increase over the previous year's minimum salaries.[13]

Local school boards, however, may supplement their teachers' salaries above the amounts required by, and funded by, the State.[14] The Wilmington Board of Education has long done so.[15] Salaries provided for in the Wilmington teachers' 1971–72 collective agreement continued this tradition,[16] and, even though the salary *increases* therein provided for

were effective for only three-quarters of the school year, the resulting actual salaries for the school year were still above the State's minimum requirements for the 1971–72 year in every category.[17] Therefore, any commitments made by the May 1 contracts were satisfied, and no wages required to be paid thereby were withheld under the authority of the Economic Stabilization Act.

The record shows that plaintiffs' salaries for the school year 1971–72 were established only by their collective bargaining agreement, and it is uncontradicted that negotiations on salary levels had not even begun as of August 15, 1971.[18] Plaintiffs' action, therefore, must fail. Since, however, the record and briefing on this issue has been concerned with many other aspects of the financial operation of the Wilmington school system, it may be well to discuss these matters, though they are not, in the Court's view, decisive.

 Plaintiffs' evidence, which shows that the Wilmington City Tax Commission and City Council approved tax levies designed to raise $5,921,013

---

mental agency having the effect of law, became effective or was finally enacted by signature of the chief executive of the governmental unit prior to August 15, 1971, or by failure of the chief executive to veto prior to August 15, 1971, or by completion of all action required for final enactment under the constitution and laws applicable to the governmental unit;

 (2) Prices have been advanced, productivity has been increased, taxes have been raised, appropriations have been made, or funds have otherwise been raised or provided for, if—

\* \* \* \* \*

 (ii) Appropriations have been passed or a budget of a governmental unit has been adopted prior to August 15, 1971, for the fiscal year in which the wage and salary increase is to take effect, and the appropriations or budget contain funds from which the increase would be payable,
. . . .

10. The contract is attached as Exhibit B to defendants' brief of December 4, 1972. See also affidavit of Russell Dineen; Madden Dep. at 20.

11. Madden p. 12.

12. Madden pp. 12–13, 21; Op.Del.Att'y. Gen. 71–081 (Aug. 6, 1971) (PX 1 to Madden dep.).

13. 58 Del.Laws c. 304 § 1 (Aug. 1, 1971).

14. Madden pp. 6, 8.

15. Dineen p. 48.

16. Compare contract, *supra* n. 10, with 14 Del.C. § 1305, as amended by 58 Del.Laws c. 304 § 1. For example, the State's minimum salary for a Bachelor with two years' experience for 1971–72 was $7,224; for a Master with five years' experience it was $8,804; for a Doctor with ten years' it was $11,062. The Wilmington rates for the same positions were, respectively, $9,190, $11,115, and $15,390.

17. For example, even assuming that only the *previous* year's legally required minimum salary was paid for the first quarter of the 71–72 school year, the Wilmington teachers' salaries for the three categories given in the previous note would have been respectively $1,388, $1,628 and $3,114 above the minimum state salary for 1971–72.

18. Affidavit of Dineen; Dineen p. 48; See Madden p. 20.

for 1971–72 school purposes, *would* go toward meeting the requirement that funds had been "raised or provided for" to cover teachers' salaries. It does not, however—even assuming, *arguendo*, an undisputed "intention", "plan", or "expectation" of a 5.5% salary increase by the Commission and Council—show that any such increase met the standards set out by the regulations interpreting Section 203(c)(3). These regulations amplify the statutory language by providing that a pay increase established prior to August 15, 1971 by "law, contract, *agreement* or *practice*" is lawfully due and payable. 6 CFR § 201.36(a) (Emphasis added). Section 201.36(c)(1)(ii) additionally provides that this requirement will be "deemed satisfied" if a pay practice was "announced . . . or otherwise clearly established" before that date. While these regulations do appear to require the payment of wage increases for which no legally binding contract was in effect prior to August 15, 1971, they were intended to apply only to "determined and definite" actions of the sort upon which reasonable men would rely. The expectations, intentions or budgetary plans which plaintiffs contend the record here shows would not satisfy these criteria.

■ The State's appropriation for teachers' salaries similarly does not justify plaintiffs' claim. Plaintiffs argue heatedly and repeatedly that the fact [19] that this item was not entirely spent in fiscal 71–72 shows that wages due the teachers were not paid them. While it is true that money appropriated for teachers' salaries may not be used for any other purpose,[20] it is not mandatory that all such money must be spent; the only requirement is that teachers be paid at least the minimum salaries prescribed by statute.[21] Ordinarily, of course, a local board of education will use all the State salary money allocated to it before supplementing teachers' salaries with its own funds.[22] But 1971–72 was no ordinary year.[23] Because of a severe fiscal crisis, all school boards were required to rebate 2% of their total State appropriations to the State.[24] Each local board could allocate this reduction among the items of its own budget however it saw fit.[25] The Wilmington School Board achieved a substantial amount of this reduction by not spending State funds which had been appropriated for teachers' salaries.[26] But whether it made up this amount with city funds, or whether it simply did not pay its teachers as much that year as it might otherwise have done,[27] is of no moment. For while the fact of a state appropriation may demonstrate that the requirement of Section 203 (c)(3) that funds have been "raised or provided for" was met, it does not, in the absence of a state law requirement that all such funds be *spent*, show that any actual salary increase was to be forthcoming.[28] In any case, the State statute requiring the 2% reversion had been adopted before August 15, 1971,[29] and thus any decrease in salaries based on the failure to expend State funds

19. While the facts are undisputed, it is not always clear just what they are. Plaintiffs rely on inconsistent figures for this assertion on pages 5 and 18 of their brief, and their sources are unclear. However, the Court assumes, *arguendo*, the existence of such a surplus; its amount, if any, is immaterial to the question at issue.

20. Madden pp. 8–9.

21. Madden pp. 8–9, 14.

22. Madden p. 16.

23. Madden p. 16; Dineen pp. 29–38.

24. *Id.*; 58 Del.Laws c. 306 (Aug. 3, 1971).

25. Madden pp. 16–17; Dineen pp. 30–31.

26. Dineen p. 33; PX 7 to dep. of Dineen.

27. See Dineen pp. 34, 39.

28. In some local school districts, by contract or tradition, the full amount of any State-funded increases in minimum salaries is passed on to the teachers, and the local supplement is maintained at the same level. Madden pp. 9–10, 19. Such a situation might present a different question. But Wilmington is not such a district, and there is no State requirement of any such pass-through. Madden pp. 8–10, 19–20.

29. See n. 24, *supra*.

would be the result of the State's own legislative action, rather than the President's action under the Economic Stabilization Act, and thus not subject to recompense under Section 203(c)(3) of that Act.

■■ Although not explicit in their argument, the real basis of plaintiffs' claims appears to be their belief that the Board of Education had planned on a salary increase of at least 5% for 1971–72, had secured the funds needed to cover such an increase, and then had been able to avoid paying it because of the "Phase I" wage freeze.[30] The short answer to this argument is that even if it is true, it does not establish plaintiffs' entitlement to back pay. The wage freeze permanently cut off pay raises that had been planned and even funded prior to August 15, 1971, unless they had *also* been specifically provided for, agreed to, announced or otherwise established prior to that date. If these provisions have caused the Board to reap a windfall, there is nothing this Court can do about it. But it certainly is not clear, on this record, that any such windfall occurred. Plaintiff's collective bargaining agreement for 1971–72 provides for a substantial increase in salary rates over the previous year. While these rates did not become effective until November 15, 1971, and while the termination of the wage freeze on that date may well have been the reason behind this contractual provision, it was the *contract*, and *not* the wage freeze, which postponed plaintiffs' salary increases until that date. There is nothing in the record to indicate that plaintiffs' union would have been able to negotiate as much of an increase in salary rates if the period during which the new salaries were to be paid would have been a full year; indeed, the more logical assumption is to the contrary.

Summary judgment will be entered for the defendants.

Submit order.

30. See Affidavit of Thomas Mitchell; questions of plaintiffs' attorney at Dineen pp. 55–56, 62–64.