**CURTISS–WRIGHT CORPORATION,**
Plaintiff,

v.

**John L. McLUCAS, Acting Secretary of
the Air Force, Defendant.**

**Civ. A. No. 807–73.**

United States District Court,
D. New Jersey.

Sept. 14, 1973.

Meyner & Wiley, by Robert B. Meyner, Newark, N. J., Sellers, Conner & Cuneo (Washington Bar), by David V. Anthony, William H. Butterfield, Washington, D. C., for plaintiff.

Herbert J. Stern, U. S. Atty., by Marc L. Dembling, Asst. U. S. Atty., Major General James S. Cheney, Judge Advocate General, Dept. of the Air Force, by Captain Ronald Holden, Washington, D. C., for defendant.

OPINION

COOLAHAN, District Judge:

This is an action for declaratory and injunctive relief with regard to an Air Force procurement contract for the overhaul, repair and rebuilding of jet engines. The plaintiff, a nationally known manufacturer of aircraft, brings this action against the Acting Secretary of the Air Force in his representative

capacity as the person ultimately responsible for the enforcement of the laws and regulations applicable to procurement by the United States Air Force. Plaintiff contends that the contract at issue was illegally awarded to a competing bidder, the Southwest Airmotive Company, in violation of specified provisions of the Armed Services Procurement Act of 1947, 10 U.S.C. § 2304 et seq., the Armed Services Procurement Regulations (ASPR) codified in 32 C.F.R. Subchapter A, Parts 1–30, the Service Contract Act of 1965, as amended, 41 U.S.C. § 351 et seq. as well as the regulations promulgated by the Secretary of Labor thereunder and codified in 29 C.F.R. Part 4. Plaintiff alleges federal question and mandamus jurisdiction, 28 U.S.C. §§ 1331, 1361, and also jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 702, to review the adverse action of an agency by which plaintiff is aggrieved.

This matter comes to the Court upon an order to show cause why the defendant Secretary should not be preliminarily enjoined from proceeding upon the Air Force contract with Southwest Airmotive Company. At the time of the return date of the order to show cause, neither party proffered testimony. The Court therefore relies upon the briefs, exhibits, and affidavits submitted to date as well as the oral argument given at the hearing on the order to show cause. No interim restraints have been granted by the Court.

It appears that on or about November 22, 1972 the Department of the Air Force, acting through the Oklahoma City Air Materiel Area (OCAMA) at the Tinker Air Force Base, issued a Letter Request for Proposals (LRFP) No. F34601–73–R–6000. The LRFP solicited bids from interested and qualified offerors for the overhaul and repair of J–57 series engines used in the Air Force's KC–135 worldwide air tanker fleet. The successful bidder was to be awarded a one-year contract to commence in April 1973, with an option open to the Air Force to continue the contract for an additional two years at the fixed contract price and for still another two years after certain price adjustments. Thus, the successful bidder had potentially a contract for overhaul and repair of jet engines spanning five years at a value estimated by plaintiff at approximately $75,000,000. For the past six years prior to the issuance of the LRFP, plaintiff had been the incumbent contractor for the Air Force on the jet engine overhaul and repair contract then being rebid. Plaintiff's prior contract with the Air Force, which includes engine repair and overhaul of aircraft other than the KC–135 air tanker, will conclude in March 1974. Of all those companies solicited by the Air Force, six responded with offers. On or about April 17, 1973 the Air Force awarded contract No. F34601–73–D–1444 to the Southwest Airmotive Company.

Unquestionably, the solicitation and award of this contract was governed by the Armed Services Procurement Act of 1947, as amended, 10 U.S.C. § 2301 et seq. This statute sets forth the rules applicable to procurement bidding and authorizes the Department of Defense to issue regulations applicable to its various contracting agencies and subentities. These regulations, known collectively as the Armed Services Procurement Regulations (ASPR), are codified in 32 C.F.R. Parts 1–30 and have the full force and binding effect of law.

Contracts falling within the Armed Services Procurement Act and its attendant regulations may also be subject to the requirements of the Service Contract Act of 1965 if the contract price exceeds $2,500 and the "principal purpose" of the contract is to "furnish services in the United States through the use of service employees." 41 U.S.C. § 351. Saving for later a discussion of the applicability of the Act, a key issue at hand, plaintiff claims numerous substantive violations of the Act. It is conceded by the defendant Acting Secretary of the Air Force that neither the LRFP or the accepted bid of Southwest Airmotive contained various statements re-

quired by the Service Contract Act, 41 U.S.C. § 351(a)(1)–(5) relating to wages and fringe benefits to be paid the contractor's employees as well as the safety of working conditions.

Plaintiff claims that the failure to include the statements mandated by the Service Contract Act is also in clear violation of the Armed Services Procurement Act, 10 U.S.C. § 2305(b), which invalidates an invitation for bids and subsequent award if the invitation does not contain "the necessary descriptive language and attachments." Plaintiff further cites the ASPR, 32 C.F.R. § 1–403, which prohibits the award of a contract unless "all applicable requirements of law" have been met.

Plaintiff advances a second theory for invalidating the Air Force award to Southwest Airmotive. It alleges that Air Force LRFP No. F34601–73–R–6000 notified all potential bidders that the repair and overhaul services being solicited were vital to national defense and "so critical" that strict compliance with the LRFP's requirements would be demanded. Plaintiff concludes from the reports submitted by an Air Force Post Award Orientation Team that Southwest Airmotive was deficient in eight of nine contract prerequisites even after it had been awarded the contract. Additionally, it is alleged that Southwest was unable to certify as required by the LRFP

that it had satisfactorily completed a jet engine overhaul and maintenance contract comparable in complexity and quantity to the J–57 engines covered by the LRFP. Plaintiff therefore asserts that the award to Southwest was illegal and in derogation of the ASPR, 32 C.F.R. §§ 2.301, 2.404–2(a), which require bids to conform in all material respects with the invitation for bids and the rejection of any nonconforming bid.[1]

In essence, plaintiff claims that Southwest Airmotive's deficiencies in technology, physical plant and managerial capacity left it far short of the minimal Air Force LRFP requirements, and that Southwest was awarded the contract only because it had outbid plaintiff by some $9 million.

On the basis of the legal deficiencies alleged in its complaint, plaintiff seeks a declaration by the Court that the Air Force contract with Southwest Airmotive No. F34601–73–D–1444 be declared illegal. Plaintiff further seeks to enjoin the defendant Acting Secretary, his employees, officers, attorneys and agents preliminarily and permanently from taking any action pursuant to or in furtherance of said contract or from committing or obligating funds of the United States for work by Southwest Airmotive. Before looking to the merits of the two arguments advanced by plaintiff,[2] the Court must address itself

1. Alternatively, plaintiff proceeds upon the theory that if Southwest met all LRFP requirements it could, in view of its alleged post-award deficiencies, have only done so if the requirements had been relaxed by the Air Force. The ASPR, 32 C.F.R. § 3.805–1(e), requires that if during the negotiations a "substantial change occurs in the Government's requirements," the invitation for bids must be amended in writing and all prospective contractors must be notified. Plaintiff argues that such modification of the specifications set out in the Air Force LRFP, if undertaken in fact, was therefore illegal and the subsequent award to Southwest Airmotive is void. However, because the Secretary of the Air Force defends on the ground that Southwest Airmotive met the specifications listed in the LRFP, the Court will not deal further with plaintiff's alternative theory.

2. Plaintiff also alleges that during the period of post-award inquiry when it was trying to learn why its bid had been rejected, the Air Force declined to release information relating to other bids and the Air Force's methods in evaluating all proposals. The complaint sets forth these refusals as violations of the Freedom of Information Act, 5 U.S.C. § 552 and the ASPR, 32 C.F.R. § 1.329. The plaintiff's prayer for relief makes no request in this regard, and it is the understanding of the Court that, however belatedly, the Air Force had by the time of the hearing on the order to show cause supplied the requested information in accordance with the discovery rules of the Federal Rules of Civil Procedure. Therefore, the Court will not take up this collateral issue in ruling upon the plaintiff's motion for a preliminary injunction.

to two jurisdictional defenses interposed by the defendant Acting Secretary.

## I. STANDING TO SUE

Preliminarily, the Acting Secretary moves to dismiss this complaint and vacate the order to show cause on the ground that plaintiff has no standing to sue. He relies upon a line of cases beginning with Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). In that case the Supreme Court held that prospective bidders desirous of selling supplies or services to the Government do not have a direct legal interest in the government procurement process and, therefore, have no standing to enforce the responsibility of officials of the executive branch acting pursuant to statutes or regulations or to represent, as in that case, the public interest in the Secretary of Labor's compliance with the Public Contracts Act of 1936. Speaking for the Court, Mr. Justice Black said:

> Courts should not, where Congress has not done so, subject purchasing agencies of the Government to the delays necessarily incident to judicial scrutiny at the instance of potential sellers, which would be contrary to traditional governmental practice and would create a new concept of judicial controversies. A like restraint applied to purchasing by private business would be widely condemned as an intolerable business handicap. It is, as both Congress and the courts have always recognized, essential to the even and expeditious functioning of Government that the administration of the purchasing machinery be unhampered.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Our decision that the complaining companies lack standing to sue does not rest upon a mere formality. We rest it upon reasons deeply rooted in the constitutional divisions of authority in our system of Government and the impropriety of judicial interpretations of law at the instance of those who show no more than a mere possible injury to the public.

310 U.S. at 130, 132, 60 S.Ct. at 878, 879. The Perkins doctrine has its genesis in earlier Supreme Court holdings, some of which held that a party to a contract cannot rely upon an official's breach of statutory duty as a basis for voiding a contractual obligation with the Government. American Smelting & Refining Co. v. United States, 259 U.S. 75, 42 S.Ct. 420, 66 L.Ed. 833 (1922); United States v. New York & Porto Rico S.S. Co., 239 U.S. 88, 36 S.Ct. 41, 60 L.Ed. 161 (1915); United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191 (1913). It has since been followed by numerous lower federal courts in actions instituted by disappointed bidders. Edelman v. Federal Housing Administration, 382 F.2d 594 (2d Cir. 1967); George Epcar Co. v. United States, 377 F.2d 225 (10th Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 473, 19 L.Ed.2d 466 (1967); United States v. Gray Line Water Tours, 311 F.2d 779 (4th Cir. 1962); Friend v. Lee, 95 U.S.App.D.C. 224, 221 F.2d 96 (1955); Fulton Iron Co. v. Larson, 84 U.S.App.D.C. 39, 171 F.2d 994 (1948); Gary Aircraft Corp. v. United States, 342 F.Supp. 473 (W.D.Texas 1972); Lind v. Staats, 289 F.Supp. 182 (N.D.Cal.1968); Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (1956).

The court in Gary Aircraft, supra, dismissed an action which had challenged Air Force procurement decisions. The court rejected plaintiff's arguments in favor of standing:

> There is still today no evidence of a Congressional desire to depart from this long-standing view that the fundamental Government procurement statutes for general public contracts, 41 U.S.C. § 5 et seq., or for military procurements, 10 U.S.C. § 2301 et seq., were designed not to protect bidders but rather to protect the Government.
>
> . . . . . .
>
> The present case amply demonstrates why injunctive suits of this nature have not been countenanced traditionally, and should not be per-

mitted here. The *Perkins* rule is neither obsolete nor legalistic, but is firmly rooted in meritorious practical considerations. Whether or not these considerations are still subsumed under the traditional standing doctrine, they should and unless the Supreme Court overrules *Perkins,* must be respected.

*Id.* at 477–787 of 342 F.Supp.

The court in *Gary Aircraft* was reluctant to pin the continuing vitality of the *Perkins* rule on the present law of standing to sue probably because of the expansive views expressed in Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Plaintiffs in the first of these companion cases sold data processing services to businesses generally. They challenged a ruling by the defendant Comptroller of the Currency that, as an incident to their banking services, national banks may make data processing services available to other banks and bank customers. The Supreme Court reversed a decision below dismissing the action for lack of standing to sue the Comptroller. First, the Court ruled that because the Comptroller's decision adversely affected plaintiffs' business by increasing competition, plaintiffs possessed such "legal interest" in the administrative decision as to satisfy the "case" or "controversy" test of Article III. The Court distinguished this from the issue of standing, which could be satisfied if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. Noting that the Administrative Procedure Act granted standing broadly to any person "aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the Court emphasized that "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action," and that the

drive to broaden the standing concept was symptomatic of that trend. 397 U. S. at 154, 90 S.Ct. at 830.

Similarly, in Barlow v. Collins, *supra,* an action brought by tenant farmers eligible for payments under the Food and Agricultural Act of 1965, 7 U.S.C. § 1444(d) challenging the validity of a certain amended regulation promulgated by the defendant Secretary of Agriculture, the Supreme Court reversed a lower court decision finding no standing on behalf of plaintiffs. Tenant farmers, said the Court, fell clearly within the zone of interests protected by the Act, to wit, that the Secretary of Agriculture is obliged by the Act to provide adequate safeguards to protect the interests of tenants. 7 U.S.C. § 1444(d)(10). The broadened scope of standing which allows suits against administrative officials by plaintiffs suing to vindicate the public interest was later observed in two environmentalist cases, Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972), and Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

These cases have caused a number of circuits to reconsider the vitality of the *Perkins* doctrine. Very recently this circuit considered the issue of standing in disappointed bidder cases in Merriam v. Kunzig, 476 F.2d 1233 (3d Cir. 1973), and concluded that the Supreme Court would no longer follow *Perkins.* Plaintiff in the *Merriam* decision was one of two unsuccessful bidders following a solicitation of bids by the General Services Administration to lease it office space in a new building to be constructed by the bidding winner. After losing the bid, plaintiff filed a protest with the General Accounting Office pursuant to 4 C.F.R. §§ 20.1–20.12 (1972). Plaintiff claimed that the bid award was void under the terms of the Independent Offices Appropriations Act of 1971, 40 U.S.C. §§ 601–615. The court cited the tests set out in *Data Processing* for justiciability and standing: legal interest in the form of injury in fact sufficient

to satisfy the "case" or "controversy" requirement of Article III, and inclusion within a zone of interest protected by the statute or regulation which plaintiff alleges to have been violated.

The court found ample damages to the unsuccessful bidder owing to costs in preparing and submitting its bid as well as the loss of present and future profits arising out of the unsecured government contract. The protected zone of interest lay in the procurement provisions of the Federal Property and Administrative Services Act of 1949, 41 U.S.C. §§ 251–260. Specifically, the court relied upon Section 253, which provides for "full and free competition" among invited bidders and for the rejection of bids not in the public interest, but not, said the court, for acceptance of bids failing to conform to the invitation for bids. Thus, the statute was construed to protect not only the governmental interest in securing advantageous contracts, but also the interest of those responding to the Government's invitation for bids. Having found the requisite standing for advancing plaintiffs' claim as private litigants, the court held that there was adequate standing to argue as a private attorney general the public interest in administrative compliance with statutory authority or the regulations enacted thereunder.

■ In so ruling, the Third Circuit relied upon the leading case of Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970), in which the court found an implicit overruling of the *Perkins* case in the passage of the Administrative Procedure Act, which permits a party aggrieved by a federal agency action to sue for redress. Other cases reflecting the growing popularity of disappointed bidder actions in the District of Columbia Circuit include Constructores Civiles de Centroamerica v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972); Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971); M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221,

455 F.2d 1289 (1971); Continental Business Enterprises, Inc. v. United States, 452 F.2d 1016 (Ct.Cl.1971); A. G. Schoonmaker Co. v. Resor, 144 U.S.App.D.C. 250, 445 F.2d 726 (1971); Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D. C. 31, 433 F.2d 1137 (1970); Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 28 L.Ed.2d 234, 433 F.2d 1204 (1970), cert. denied, 401 U.S. 950, 91 S.Ct. 1186 (1971); General Electric Co. v. Seamans, 340 F.Supp. 636 (D.D.C.1972); Keco Industries v. Laird, 318 F.Supp. 1361 (D.D.C.1970); Simpson Electric Co. v. Seamans, 317 F.Supp. 684 (D.D. C.1970). The courts of other circuits as well have likewise found standing in favor of aggrieved bidders who have alleged agency violations of statutes or regulations in the procurement of goods or services for the Government. Rudolph F. Matzer & Associates, Inc. v. Warner, 348 F.Supp. 991 (M.D.Fla. 1972); Pace Co., Division of Ambac Industries, Inc. v. Department of Army, 344 F.Supp. 787 (W.D.Tenn.1971); City Chemical Corp. v. Shreffler, 333 F.Supp. 46 (S.D.N.Y.1971). *See also* Lloyd Wood Construction Co. v. Sandoval, 318 F.Supp. 1167 (N.D.Ala.1970), rev'd on other grounds, 446 F.2d 261 (5th Cir. 1971).

The bidding in the present action was followed pursuant to the Armed Services Procurement Act of 1947, 10 U.S.C. §§ 2301–2314. There exists a great similarity between 10 U.S.C. § 2305 and 41 U.S.C. § 253, the section upon which the Third Circuit relied heavily in determining that a losing bidder fell within a statutory zone of interest in the *Merriam* decision. Like Section 253, Section 2305 sets forth the manner in which bids are to be invited and accepted or rejected. Like Section 253, Section 2305 implicitly requires the rejection of nonconforming bids. Given the *Merriam* rationale as well as the number of cases which have specifically permitted challenges to armed forces procurement, *e. g.*, Wheelabrator Corp. v. Chafee, *supra*; M. Steinthal & Co. v. Seamans, *supra*; A. G. Schoonmaker Co. v. Resor, *supra*;

Rudolph F. Matzer & Assoc., Inc. v. *Warner, supra*; Pace Co., Division of Ambac Industries, Inc. v. Department of Army, *supra*; General Electric Co. v. Seamans, *supra*; and City Chemical Corp. v. Shreffler, *supra*, the Court is constrained to find that the interest sought to be protected and vindicated by the plaintiff is arguably within the zone of interests protected and regulated by the provisions of the Armed Services Procurement Act of 1947, 10 U.S.C. §§ 2301–2314. The Court therefore holds that plaintiff has standing to advance his allegations of bidding impropriety both as a private litigant and as a private attorney general in vindication of the public interest in compliance by the procuring agency with the appropriate statutes and regulations thereunder.

## II. REVIEWABILITY OF THE ACTIONS OF THE DEFENDANT ACTING SECRETARY OF THE AIR FORCE

Distinct from the issue of standing is the question whether this Court has the judicial power to review the actions of the defendant Acting Secretary which culminated in the awarding of this contract to Southwest Airmotive. The Court will set forth those actions in moderate detail and will rely upon the affidavits of the procurement officers submitted in this regard.

Air Force Contract No. F34601–73–D–1444 for the overhaul, repair and/or modification of J–57 series jet engines [3] was the product of a model or uniform contract format for jet engine overhaul and repair drafted by officers of the Air Force Logistic Command (AFLC) in 1970. It was developed as part of an overall program for the improvement of contracting procedures so as to achieve greater uniformity in the contract format used in the procurement activities of the AFLC. The drafting officers re-

lied upon their past experience in procurement administration and have updated the model contract with revisions to accommodate changes in statutes, executive orders, regulations as well as changes in procurement policy. Chapter 14 of the Air Force Logistic Command Regulations 70–4 directs that procurement officers utilize the model contract in all buying activities for engine overhaul and modification. For reasons to be explored later, the model contract does not contain the requirements of the Service Contract Act of 1965, 41 U.S.C. § 351 et seq. as amended.

For a number of years prior to the solicitation of offers for Contract No. 34601–73–D–1444, Curtiss-Wright had performed the overhaul and repair work on the Air Force's J–57 series jet engines. However, in a period just prior to October 1972 the Air Force determined that the competitive environment had matured to the point where it was no longer deemed necessary to fulfill the overhaul and repair requirements by way of sole source procurements as historically done. It was believed that sufficient qualified contractors could be solicited through a modified competitive bidding scheme to achieve substantial cost saving without sacrificing technical efficiency.

Owing to the importance of the J–57 engine and the size of the Air Force fleets utilizing that engine, it was determined that the Air Force would employ a method of procurement known as Source Selection, which is used for complex and major procurements where a long-term contract is anticipated and where maximum emphasis is to be placed on the technical capacity of the potential contractor. Source Selection procedures and considerations are outlined and governed by Air Force Regulations (AFR) 70–15, Air Force Manual (AFM) 70–10 and AFLCR 70–4.

3. The J–57 engine is used in two Air Force aircraft, the KC–135 jet tanker and the F–101 jet fighter. The major use of the KC–135 aircraft is the airborne refueling of oth-

er aircraft, principally SAC bombers. The F–101 jet fighter is an air defense and tactical reconnaissance aircraft.

In initiating the Source Selection procedure, several preliminary matters were necessary. Pursuant to AFR 70-15 the delegate defendant Acting Secretary appointed Major General W. Y. Smith, Commander, Oklahoma City Air Material Area (OCAMA), to serve as the Source Selection authority (SSA) for this project. The function of the SSA is to appoint the Source Selection Advisory Council (SSAC) and Source Selection Evaluation Board (SSEB) Chairmen, select SSAC personnel, generally oversee the Source Selection project, and, most important, make the contract award. The function of the SSAC is to establish specific evaluation criteria, determine their relative importance by assigning a weight to each factor considered and to appoint SSEB personnel and direct their work. Upon receipt of the SSEB findings, the SSAC prepares a proposal analysis for the SSA to enable him to make a proper judgment in awarding the contract. General Smith appointed Colonel J. A. Muehlenweg, Director of Procurement and Production, OCAMA, to serve as the SSAC Chairman.

The primary function of the SSEB is the evaluation of proposals as initially received and the negotiation of contract details with each company within a competitive range permitted by the contract specifications set out by the LRFP. Colonel Jack R. Lindeman, Program Manager, Worldwide Airborne Command Post Systems, Directorate of Materiel Management, OCAMA, was appointed to serve as the Chairman of the SSEB. To assist the SSEB Chairman in evaluating the proposals to be solicited a co-chairman was appointed for each of six technical areas in which the offerors would be evaluated.

Once these preliminary matters had been accomplished, the project moved to the solicitation stage, to be followed by proposal evaluation and the adjustment of contract details. The latter process is known as the contract definitization phase and is administered by the Contract Definitization Group (CDG). The original contract specifications were, of course, set out in LRFP F34601-73-R-6000, which was mailed to eight, preselected contractors on November 22, 1972. These included both Southwest Airmotive and Curtiss-Wright. Subsequently, six other contractors requested and were given the LRFP.

LRFP F34601-73-R-6000 is a voluminous, comprehensive document running approximately 250 pages. It sets out in technical detail the exact Air Force requirements and specifications, the criteria for evaluating offers, and the documentation needed from the offeror to establish his competence. Minor amendments of the LRFP were in fact made on three occasions, none of which concern us since those changes were essentially administrative and did not modify the evaluation criteria or their respective weight.

The LRFP lists eight evaluation factors in Section D to which all offerors must respond with appropriate information. The fifth factor is entitled "GENERAL INFORMATION AND SELECTION CRITERIA" and includes six general areas of technical competence. Listed as they appear in the LRFP in order of importance they are: (1) Management Capabilities; (2) Facilities and Equipment; (3) Production Plan; (4) Quality Control; (5) Experience; and (6) Safety. Attachments to the LRFP broke down these general areas into "items," "factors," and "sub-factors." Items were to be given a raw, numerical score by the SSEB, while factors and sub-factors were to be given only a subjective rating of check, plus or minus. Once compiled, the scores were ultimately weighted by the SSAC to indicate a final numerical score. It should be noted that price is the sixth of eight general evaluation factors listed in Section D and is mentioned elsewhere in the LRFP as a consideration in making the award.

Following the issuance and distribution of the LRFP, six contractors submitted timely proposals on or before January 26, 1973. Among them were

Curtiss-Wright and Southwest Airmotive. Once received, the information in the proposals was sent to an appropriate evaluation committee; there was a single cost-price panel as well as a panel for each of the general areas of technical competence cited heretofore.[4] Applying the pre-established standards and procedures each SSEB panel evaluated the particular area for which it was responsible. Scores were assigned and deficiencies noted in Deficiency Report forms. After those deficiencies had been collated by area co-chairmen at the conclusion of the SSEB evaluation, the contractor was advised of any such deficiencies. In turn, the contractor responded to the deficiency notice and was re-evaluated. Both Curtiss-Wright and Southwest Airmotive underwent this procedure. Where a contractor's response was still inadequate, the remaining discrepancies were adjusted by face-to-face negotiations, which were conducted with each offeror in February and March 1973. The results of these conferences were similarly evaluated by the SSEB.

A nine-volume summary report of all evaluations was prepared by the SSEB and presented to the SSAC on March 23, 1973. The SSAC directed an on-site review shortly thereafter to determine whether each offeror had been able to resolve reported weaknesses so as to bring his proposal into compliance with the specific requirements of the LRFP. The SSAC then analyzed the SSEB Report and prepared a Proposal Analysis Report of some 150 pages, which was submitted to the SSA on April 9. The SSCA Report reflected the weighing of scores prepared by the SSEB, which, to preserve the integrity of the scoring system, had not been advised of the actual weights involved.

After reviewing the SSAC Report and an oral briefing, General Smith, the SAA, determined that three offerors, including Curtiss-Wright and Southwest Airmotive, had the technical capacity to perform the required overhauling and repair services. Considering the technical evaluations before him and the fact that the Southwest Airmotive proposal was substantially less costly, he awarded the contract to Southwest Airmotive. His decision was subsequently approved by the Commander, Air Force Logistics Command after review by the Commander's staff. On April 17, 1973 Southwest Airmotive was formally awarded the contract. The next day all unsuccessful offerors were notified of the selection. It may be finally noted that the entire Source Selection process for Contract No. F34601–73–D–1444 required some 14,000 man-hours of Air Force Personnel.

It is the contention of Curtiss-Wright that the statistical data cited in the SSAC Report as well as the information reaped from the Post-Award Conference Record (prepared by the Post-Award Orientation Team) conclusively demonstrates that the proposal of Southwest Airmotive was non-responsive to and non-compliant with the LRFP and should have been rejected. Section D–8 of the LRFP does in fact refer to the "very critical" nature of the services to be rendered, which, if improperly performed, "may endanger human life." Besides listing six specific areas of technical competence in Section D–5 the LRFP in Section D–8 makes it "mandatory" that:

(1) The facility proposed for contract performance must have prior to award of a contract:

(i) A full time facility manager with experience and training to qualify him for managing a complex program;

(ii) A property administrator experienced in the administration of

---

4. The Procuring Contracting Officer carefully sorted cost-price information from the technical information submitted in order to prevent an extraneous influence in the evaluation of either category. The cost-price panel functioned apart but as an adjunct to the SSEB, whose panels evaluated only the areas of technical competence.

Government property under Defense Maintenance Contracts;

(iii) Qualified contract administrator(s);

(iv) A production manager experienced in engine scheduling and maintenance work;

(v) A Quality control manager experienced in implementing Quality Assurance and Inspection Procedures and Standards;

(vi) A safety manager experienced with Government safety standards applicable to jet engine maintenance contracts.

(2) The offeror, as a company, corporation or other entity, has satisfactorily performed work on engine maintenance programs within the last five years (FY 1968 through FY 1972) where:

(i) The engine programs satisfactorily performed were major overhaul and maintenance;

(ii) The engine programs satisfactorily completed provided for a quantity comparable to that covered by this solicitation;

(iii) The engines applicable to the program(s) satisfactorily completed were of a jet engine class comparable to the J–57.

(3) The offeror, as a company, has available for performance of proposed procurement, the facilities and equipment prerequisite to the requirements of J–57 engine overhaul.

Following the award of Contract No. F34601–73–D–1444 to Southwest Airmotive an Air Force Post-Award Orientation Team visited its facilities. Plaintiff contends that the Post-Award Conference Report filed by the Orientation Team conclusively demonstrates that specific requirements of the LRFP, whose satisfaction was mandatory before the award, were unsatisfied even after the award to Southwest Airmotive.

It is alleged that Southwest Airmotive did not have an adequate quality plan nor an adequate quality manual, that it lacked the required inspection stations or work centers, that the inspection worksheets were completely inadequate because they were "commercial engine oriented" and hence of little value to the overhaul of the J–57 series jet engine, that experienced quality and inspection personnel were yet to be hired, that safety equipment and procedures were inadequate, and, most important, that Southwest did not have either the facilities or equipment necessary to perform the overhaul work contemplated by the LRFP.

Plaintiff further contends in this respect that the Air Force unlawfully minimized the emphasis upon technical capacity in favor of price considerations. Plaintiff relies upon its superior weighted area scores given it by the SSAC in its Proposal Analysis Report. These scores reflect the "weights" given respective ratings by the SSEB of each offeror for each of the six areas of technical capacity of Section D–5 cited heretofore by the Court. The following is a summary of the scoring between Southwest Airmotive and Curtiss-Wright:

| Area | Southwest Airmotive | Curtiss-Wright |
|---|---|---|
| Management | 149 | 173.5 |
| Facilities | 122 | 207.5 |
| Production | 73 | 131 |
| Quality | 97 | 93 |
| Experience | 60 | 87 |
| Safety | 30 | 40.5 |
| Total | 531 | 732.5 |

Plaintiff alleges that even after the contract award, Southwest Airmotive was deficient in all six areas of technical capacity in some respect or another. It claims that owing to the alleged assertion of price considerations over technical capacity by the SSA in making the contract award, the Air Force had created the possibility of a "buy-in" [5] to

5. ASPR, 32 C.F.R. § 1.311 defines buying-in as "the practice of attempting to obtain a contract award by knowingly offering a price or cost estimate less than anticipated costs with the expectation of either (1) increasing the contract price or estimated cost during

which plaintiff had not been alerted or responsive.

Numerous cases have arisen in recent years which demonstrate the judicial interest in safeguarding the integrity of the procurement system of the agencies of the United States. In those cases which have permitted standing to an aggrieved bidder, the courts have said that review of agency determinations may be had under the auspices of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Under the Act relief by way of judicial review is available to any person suffering legal wrong because of agency action, or adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. However, the Act limits the scope of review to a determination as to whether a particular agency action, finding or conclusion has been arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

While the majority of the *Scanwell* progeny have dealt with technical violations of the contract negotiation and bidding procedures of a Government agency, the case of Scanwell Laboratories, Inc. v. Shaffer, *supra,* did itself establish the principle of judicial reviewability in these matters where the aggrieved bidder raised a claim of nonresponsive bidding similar to the claim presently before the Court. In *Scanwell* the FAA had issued an invitation for bids for instrument landing systems to be installed at airports to guide aircraft along a predetermined path to a landing approach. Plaintiff, the second-lowest bidder, alleged that the low bidder's proposal was nonresponsive because it did not, as required by the invitation for bids, have an operation system installed, tested, and certified by an FAA flight check in at least one location prior to submission of its bid. Relying upon the provisions of the Federal Procurement Regulations,[6] the court held that plaintiff was entitled to a day in court to prove his factual allegations.

Several other courts have considered the issue of judicial review of a contract award determination that a winning bid has been responsive or in conformity with the specifications of the invitation for bids where the award is governed by the Armed Services Procurement Act of 1947, as amended, 10 U.S.C. § 2301 *et seq.* and the Regulations thereunder. In Pace Co., Division of Ambac Industries, Inc. v. Department of Army, *supra,* the court dealt with an Army solicitation for the procurement and delivery of a quantity of 81MM shells for Vietnam. The winning bidder admittedly had submitted an underestimated transportation cost to gain a competitive advantage over plaintiff, which had submitted the lowest unit cost. The court cited Section 2305(b) of the Act, which states:

> The specifications in invitations for bids must contain the necessary language and attachments, and must be sufficiently descriptive in language

the period of performance through change orders or other means, or. (2) receiving future 'follow-on' contracts at prices high enough to recover any losses on the original 'buy-in' contract. Such practice is not favored by the Department of Defense since its long-term effects may diminish competition and it may result in poor contract performance. . . . "

6. The court relied upon 41 C.F.R. § 1–2.-301(a), which requires for award consideration that "a bid must comply in all material respects with the invitation for bids so that, both as to the method and timeliness of submission and as to the substance of any resulting contract, all bidders may stand on an equal footing and the integrity of the formal advertising system may be maintained," and 41 C.F.R. § 1–2.404–2(a), which states that "[a]ny bid which fails to conform to the essential requirements of the invitation for bids, such as *specifications,* delivery schedule or permissible alternates thereto, shall be rejected as nonresponsive." (Emphasis added.) Because Section 1–1.004 limits the applicability of the Federal Procurement Regulations to non-military contracts, with exceptions, the Department of Defense has been able to enact its own ASPR. The provisions of the ASPR which are in effect corollaries to the provisions cited and relied upon by the *Scanwell* court will be discussed within.

and attachments, to permit full and free competition.

The ASPR, 32 C.F.R. §§ 2.301(a), 2.-404–2(a), further state:

> To be considered for award, a bid must comply in all material respects with the invitation for bids so that, both as to the method and timeliness of submission and as to the substance of any resulting contract, all bidders may stand on an equal footing and the integrity of the formal advertising system may be maintained.

> . . . . . .

> Any bid which fails to conform to the essential requirements of the invitation for bids shall be rejected.

The ASPR have the full force and effect of law. Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). The court concluded that there existed no rational basis for the award to the misrepresenting bidder, even though it intended to fulfill its contractual obligations. The court held that because the misrepresentation of the winning bidder was material within the meaning of the ASPR, 32 C.F.R. § 2.301(a), any award to it would constitute an abuse of discretion by the contracting officer.

The court in Kentron Hawaii, Ltd. v. Warner, 156 U.S.App.D.C. 274, 480 F.2d 1166 (1973), was faced with allegations of bidding non-responsiveness, feasibility and illegality. The Navy had amended its solicitation by requesting the bidding parties to take into account the possibility that unionization would affect wage rates. Plaintiff contended that because the maximum wage rate bid by the successful bidder was *less* than what the successful bidder was paying at the time of the award, the bid was necessarily non-responsive. In reviewing plaintiff's argument, the court ruled that the bid winner's business judgment was not the court's or the Navy's concern since any overrun labor costs would not be reimbursable. The court dismissed as speculative plaintiff's allegations that higher, unionized wage rates would drive the successful bidder into bankruptcy and that a violation of the "successor doctrine" would necessarily arise from its hostility to unionization.

Keco Industries, Inc. v. Laird, *supra,* determined that the integrity of the procurement procedures for negotiated contracts should be the same as for advertised contracts, although wider administrative discretion was available to procuring officials in negotiated awards. There the court upheld as rational a determination by the Air Force that plaintiff's air conditioning units were ineligible for waiver of first article testing because a major component part had been added to an already tested and qualified unit. And in General Electric Co. v. Seamans, *supra,* a case dealing with the procurement of operation and maintenance services for remote tracking stations, plaintiff's allegation was remarkably similar to the one at bar. The Air Force had employed the Source Selection procurement method as in this case. In evaluating plaintiff's proposal, the Source Selection Authority determined that its price was unrealistically low. Although the court was primarily concerned that plaintiff had never been notified that its revised bid was considered too low, it also noted that the Air Force had violated its own procurement regulations by failing to score all revised proposals numerically. Said the court:

> There appears in the record and in the regulation no sanction for avoiding numerical scoring at the second, decisive phase of the two-phase negotiations, nor is there in this record any authorization for deviations from the language of the regulation requiring scoring. *The result of failing to score numerically was that the cost estimates and the technical evaluation became inextricably entwined.* [Emphasis added.]

340 F.Supp. at 640. The instant case presents a variation of that problem. Here, the claim is that the Source Selection Authority improperly ignored the numerical scoring contained in the

SSAC Proposal Analysis Report and considered price preeminently if not exclusively.

Similarly, in Constructores Civiles de Centroamerica v. Hannah, *supra,* the Third Circuit held a decision of the Agency for International Development (AID) that a Honduran construction company was not a qualified bidder under AID Capital Project Guidelines was not a determination beyond the pale of judicial review pursuant to the Administrative Procedure Act. Other cases permitting judicial review of alleged agency violations of procurement regulations and terms for contract negotiations and awards set by the agency itself include Wheelabrator Corp. v. Chafee, *supra* (choice of procurement scheme); M. Steinhal & Co. v. Seamans, *supra* (reopening of bidding); Continental Business Enterprises v. United States, *supra* (duty to negotiate, sufficiency of information in solicitation); A. G. Schoonmaker Co. v. Resor, *supra* (sufficiency of information in solicitation); Blackhawk Heating & Plumbing Co. v. Driver, *supra* (qualification as "responsible bidder"); William F. Wilke, Inc. v. Department of Army, 357 F.Supp. 988 (D.Md. 1973) (timeliness of bid); Rudolph F. Matzer & Associates, Inc. v. Warner, *supra* (evaluation improprieties, improper unilateral negotiation); General Electric Co. v. Seamans, *supra* (duty to negotiate, sufficiency of information in solicitation, violation of scoring procedure); and Simpson Electric Co. v. Seamans, *supra* (timeliness of bid). See also Merriam v. Kunzig, *supra,* which discusses bidder responsiveness to solicitation specifications in the context of civil contracts governed by the Federal Property and Administrative Services Act of 1949, 41 U.S.C. §§ 251–260.

▮ Plaintiff's claim of reviewability is apparently sanctioned by the preceding line of cases. It must always be remembered that a presumption of reviewability always attends an attack upon agency discretion, and it is therefore incumbent upon the Government to prove that the right of judicial review has been taken away. Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*; Association of Data Processing Service Organizations, Inc. v. Camp, *supra*; Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Of course, judicial review of agency action is impermissible by the express terms of the Administrative Procedure Act whenever "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). It is true that pursuant to the Armed Services Procurement Act the procuring agency has broad discretion in the acceptance or rejection of conforming bids.[7] However, it is equally true that nowhere is any procuring agency given authority for the acceptance of a non-conforming bid.[8] Nor has any court of the *Scanwell* line of cases employed the "committed to agency discretion" rule of 5 U.S.C. § 701(a)(2) to restrict review of procurement negotiation and contract award.[9]

---

7. Section 2305(c) of the Act provides in part that awards shall be made "to the responsible bidder whose bid conforms to the invitation and will be the most advantageous to the United States, price and other factors considered. However, all bids may be rejected if the head of the agency determines that rejection is in the public interest."

8. See ASPR, 32 C.F.R. §§ 2.301(a), 2.404–2(a) cited in text at p. 23, *supra.*

9. Plaintiff has expressly disavowed any attempt to obtain judicial review of either the factors and areas of technical competence set forth in the LRFP and subsequently evaluated by the SSEB or the weights assigned to those factors and areas by the SSAC as reflected in its Proposal Analysis Report. Nor does the Court understand plaintiff to seek review of means by which raw data was collected, evaluated or complied either during the intial stages of receiving bids or the later stages of individualized negotiations.

Indeed, plaintiff's sense of litigative restraint is well founded. The preparation of the model contract employed by the Air Force in the solicitation for Contract No. F34601-73-D-1444 as well as the actual evaluation of proposals involved a staggering number of man hours, running well into the tens of thousands. Clearly, Congress never

Therefore, this Court may properly review the award of Contract No. F34601–73–D–1444 to Southwest Airmotive to determine non-conformities of its proposal, if any, with LRFP 34601–73–R–6000 so as to render its proposal legally unacceptable under the ASPR, 32 C.F.R. §§ 2.301(a), 2.404–2(a) and the contract award void as not in accordance with the law under Administrative Procedure Act, 5 U.S.C. § 702.

▮ Passing onto plaintiff's claim of non-compliance with the requirements of the Service Contract Act, 41 U.S.C. § 351, et seq., it is unclear whether the Air Force posits its defense on the inapplicability of the Act or on the reasonableness of its determination of inapplicability.[10] Although there is support in the law for either position,[11] the Court finds it unnecessary to resolve the issue of the scope of review since it is of the opinion that, for the reasons hereinafter assigned, this determination should have been and will be made by the Secretary of Labor. It is sufficient to note at this point that the issue before the Court with regard to the applicability of the Service Contract Act, as amended, 41 U.S.C. § 351(a), to this contract, *viz.*, whether its "principal purpose" is the furnishing of services, is judicially reviewable. In City Chemical Corp. v. Shreffler, *supra*, the court reviewed a Navy determination that a successful bidder was a "manufacturer" or "general dealer" under the Walsh-Healey Act, 41 U.S.C. § 35(a). And in Kentron Hawaii, Ltd. v. Warner, *supra*, the court entertained plaintiff's allegation of illegality in a Navy contract award where the Secretary of Labor had not issued a "wage determination" pursuant to a

---

intended judicial intervention to enter so broadly into the administrative decision making process, and such factoring and grading is properly regarded as committed to the discretion of the procuring agency. 5 U.S.C. § 701(a)(2). See Saferstein, "Nonreviewability: A Functional Analysis of 'Committed to Agency Discretion,'" 82 Harv.L.Rev. 367, 371 (1968). In so determining the Court views as pertinent the following considerations: (1) the plethora of factors and weights available to assignment in making such contract awards—as this is some indication of the discretion properly belonging to the procuring authority; (2) the Court is obviously reluctant to become entangled in thickets of protracted litigation in a highly technical area for which it has little if any expertise; (3) judicial involvement would ultimately serve only to "educate" procuring authorities as to how to embellish their intra-agency work product to satisfy judicial review or avoid it altogether; (4) the potential for voluminous, lengthy litigation follows naturally from such expanded review. *Id.* at 380–393. See also Rudolph F. Matzer & Associates v. Warner, *supra* at 995, of 348 F.Supp. where the court held the manner of weighing price factors was beyond the pale of judicial review, and Wheelabrator Corp. v. Chafee, *supra* at 1309–1311 of 455 F.2d, where a Navy decision to employ a two-step formal advertising bidding procedure in favor of a negotiated bidding procedure was held to be nonreviewable.

10. Counsel did at the time of oral argument advert briefly to the reasonableness of defendant Secretary's decision to treat this contract as controlled by the provisions of the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35. But defendant's memoranda and supporting affidavits do not follow this line of thought.

11. As Professor Davis has noted, the courts have had no small difficulty in distinguishing between reviewable questions of law and reviewable questions of discretion. 4 K. Davis, Administrative Law Treatise ¶ 28.16 at 86 (1958). No less baffling has been the dilemma of whether the reviewing court should substitute its judgment as to the law determined by the agency and thus decide its "rightness," or instead simply decide if a "rational basis" existed for such determination. *Id.*, § 30.01 at 189 et seq. For example, in Merriam v. Kunzig, *supra* at 1243–1244 of 476 F.2d, the Third Circuit rejected a Government interpretation of the Independent Offices Appropriations Act, 1971, and the Public Buildings Amendments of 1972, 40 U.S.C. §§ 601–615, as amended, whose application to the solicitation in question was contested much the same as the Air Force presently argues with respect to the Service Contract Act. In disallowing summary judgment on that point, the court referred to the Government interpretation as "sophisticated but dubious" but did not state precisely the standard of review because other issues within the complaint precluded summary judgment in any event.

statutory exemption of the Service Contract Act, 41 U.S.C. § 353(b).

## III. THE MERITS OF PLAINTIFF'S CLAIM OF NON-CONFORMITY

We begin our analysis with the claim made by plaintiff that Southwest Airmotive was deficient in the six areas of technical deficiency set forth in Section D–5 of the LRFP and as reflected in plaintiff's superior rating to Southwest Airmotive in those areas in the SSAC weighted scores in those areas, *i. e.*, Curtiss-Wright, 732.5; Southwest Airmotive, 531 (see p. 20, *supra*, for breakdown). These six areas of technical competence were subdivided into 27 factors, all of which were scored and weighted to produce the final totals. Of these, the Air Force scored Curtiss-Wright below standard in four instances, while Southwest Airmotive was scored below standard in 15 instances. However, it is absolutely vital to bear in mind that standards set by the Air Force for determining whether a particular factor had been satisfied were not part of the LRFP and therefore not a contract specification subject to a claim of "non-conformity." Such standards were internal, administrative formulae for computing technical tolerances.[12]

Their determination was surely as discretionary as the assignment of values and weights to the six areas of technical competence. Therefore, the fact that Southwest Airmotive fell short in 15 of 27 factors is insufficient to demonstrate non-conformity with the LRFP requirements.

Even more significant, these scorings do not reflect the final Air Force evaluation of the respective offerors. As noted in the SSAC Report, these scores are evaluations of the original proposal only. In further discussion following those scores, "the results are indicated of subsequent proposal clarifications and negotiation in correcting proposal discrepancies and eliminating or reducing the original risk." This evaluation was further modified by on-site review by Air Force procurement authorities. As a matter of final evaluation, the SSAC had this to say about Southwest Airmotive's qualifications:

Southwest Airmotive possesses a strength in the form of extensive experience in the overhauling of both military and commercial engines of a high thrust range. This offeror has a large work force of experienced and trained personnel coupled with exten-

---

12. With regard to the initial SSEB scoring and SSAC weighing of technical capacity ratings, plaintiff alleges that the proposal of Southwest Airmotive was non-conforming because it failed to achieve the minimal 600 of 1,000 points. The figure of 600 as the minimally acceptable score may perhaps be inferred from Section III of the Proposal Analysis Report. However, it does not appear in the LRFP. Indeed, it could not, since the assignment of weights to SSEB scoring was unknown even to the SSEB, let alone the offerors. The LRFP is quite clear that any failure or shortcoming sufficient to eliminate an offeror must appear as a specification in the LRFP. Section D–5 of the LRFP, in discussing the evaluation standards, states:

Evaluation of the proposals will be accomplished by comparing proposal elements against predetermined standards developed by the government specifically with regard to those criteria for this program. The standards are prepared prior to receipt of

proposals and are consistent with the requirements of the RFP. The content of these standards, to the extent that they do not establish a minimal acceptable level of quality or capability, will be divulged only to government personnel directly involved in the evaluation and source selection process. All requirements or standards describing a minimal acceptable level which are sufficient to eliminate a competitor from the competition if he fails to meet them will be specified or otherwise evident in the RFP and accompanying materials, including the specifications and statement of work.

Further, since later negotiations were successful in eliminating all but one minor risk from the Southwest Airmotive proposal, it is easy to see the Air Force's need for flexibility in applying its own internal scheme of values and weights. It should especially be remembered that price/cost considerations were excluded from the 1,000 point scoring analysis.

sive modern facilities. Following negotiations, it met the standard for all items with the exception of a minor weakness in numbers and skills of production planning personnel, and a history of quality complaints slightly above standard. During the on-site review it was determined that the production planning staffing deficiency had been adequately resolved. An apparent weakness in the numbers of test cells was converted to a strength when the on-site review revealed possession of a previously undisclosed back-up test cell. . . . *In summary, both negotiations and on-site review revealed its capabilities are substantially better than those displayed in its original proposal.* It has the capacity to perform at a realistic price with no significant risks.

Later, in discussing the number of discrepancies in the original Southwest Airmotive proposal, the SSAC emphasized that

. . . the majority of the discrepancies were errors of omission, requests for clarification, or for additional data. Of the identified discrepancies, proposal changes and supplemental information incorporated into the proposal resolved the majority. Two deficiency areas remain, constituting minor risk in the area of inadequate testing cell back up and sufficiency of the number of Production Control Staff members.

The finalized findings of the SSAC Report flatly state that "Southwest Airmotive Company is capable of accomplishing this program. Negotiations and on-site review indicated that this company's capabilities are much better than portrayed by its original proposal. The offeror has extensive experience on similar engines and the price proposal is realistic."

We turn now to plaintiff's contention that Southwest Airmotive did not satisfy the demonstration of responsibility criteria of Section D–8 prior to the time of award. Its allegations are set forth at pp. 19–20, *supra.* In this regard it should be noted that the SSAC Report does not cite any deficiencies in demonstration of responsibility in its summary of deficiencies or finalized findings. The Court has further examined the Post-Award Conference Record, upon which plaintiff primarily relies, as well as the affidavits of Post-Award Orientation Team members and Mr. James N. Nelson, Secretary and Director of Government Projects for Southwest Airmotive. There is no indication in the record that at the time of the award Southwest Airmotive did not in fact have in its employ, as required by Section D–8(1)(i)–(vi) of the LRFP, a full-time facility manager, a property administrator, a contract administrator, a production manager, and a safety manager, all of whom were duly qualified to perform as required by the stated criteria of those subsections. The facts before the Court in this regard reveal only an expansion of Southwest Airmotive's safety program and a consequent rehiring of a new safety manager.

Plaintiff alleges that Southwest Airmotive did not demonstrate prior to award its satisfactory completion of jet engine overhaul and maintenance programs within the last five years, *per* Section D–8(2) of the LRFP, but the Court again finds little support to sustain the allegation. By affidavit the Air Force states that over the past fifteen years, Southwest Airmotive has overhauled, repaired and processed 26,362 jet power plants of all types, and, more to the point, it has performed overhaul and maintenance on a myriad of commercial jet engines comparable in thrust to the J–57 series jet engines. The SSAC analysis is in complete agreement:

Southwest Airmotive's past experience exceeds the standard. Experience has been gained on the overhaul for the Air Force and Navy engines in excess of 5,900 pounds of thrust and commercial engines in the 12,000 to 19,000 pounds of thrust range. Ex-

perience has also been gained on the large commercial engines up to 50,000 pounds thrust category. Southwest has demonstrated extensive jet engine overhaul experience. Offeror, however, failed originally to provide schedules reflecting the magnitude of schedule delinquencies in terms of the schedule versus production. Subsequently, following the evaluation of the offeror's response which provided the statistical evidence of past performance the discrepancy was resolved to the satisfaction of the SSEB.

Elsewhere the SSAC states that Southwest Airmotive has had five years' experience with the JT3 engine, the commercial equivalent of the J57 and that performance has been satisfactory.

About the only allegation bearing some substance is that Southwest Airmotive did not, as required by Section D–8(3) of the LRFP, have facilities and equipment adequate for performance prior to the award. The Conference Report notes that inspection stations and work centers had not been established at that time since "production plans are presently in a state of flux." It is important to remember that Contract No. F34601–73–D–1444 anticipated the overhaul and maintenance of hundreds of jet engines over a period of perhaps five years. Obviously, if the work was not to be performed by the incumbent, that is, if the Air Force was to have truly competitive bidding for the contract, a certain amount of phasing with respect to facilities would have to occur. Otherwise, a company would have to invest a vast sum of money in order to insure its readiness for performance merely on the expectation or hope that it would be awarded the contract. The same would be just as true of personnel needs. Certainly, a contractor who was about to commence upon such a vast project would not be expected to begin at the same pace expected of an incumbent.[13] A reading of the SSAC Report and the supporting affidavits of the Air Force satisfies the Court that the quality of Southwest Airmotive's preparedness at the time of the award was in substantial compliance with the facilities and equipment requirements of Section D–8(3) of the LRFP.

Finally, the Court is of the opinion that plaintiff's allegations as to Southwest Airmotive's lack of a quality plan or quality manual, the inadequacy of safety equipment and procedures, and the inadequacy of inspection worksheets go to considerations of competence in the areas of management and safety under Section D–5 of the LRFP already discussed by the Court. Treating the Air Force's motion to dismiss as a motion for summary judgment pursuant to Rule 56, Fed.Rules Civ.Proc.,[14] the Court believes that the plaintiff has failed to make out a prima facie showing of any arbitrary or capricious action by the Air Force procurement authorities, or any action not sanctioned by or which is beyond the scope of procurement authority pursuant to the Armed Services Procurement Act, 10 U.S.C. § 2304 et seq. and the attendant ASPR, 32 C.F.R. Subchapter A, Parts 1–30. Specifically, the Court holds that as a matter of law the Air Force did not abuse its discretion

---

13. A member of the Air Force Post-Award Orientation Team avers that during his visit, "it was noted that the contractor had not firmly established inspection stations and work centers throughout the overhaul and test area, since the establishment of same is *contingent upon availability of products at a given work station.* This is not considered a deficiency since only two engines had been input to the contractor and certain work stations were not established because engine components (products) had not been available for particular stations."

14. Rule 12(c), Fed.Rules Civ.Proc., provides: "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *See generally* 2A J. Moore, Federal Practice ¶ 12.15 at 2342 (2d ed. 1972).

within the meaning of 5 U.S.C. § 706(2)(A) in determining that the proposal of Southwest Airmotive conformed to the requirements and specifications of LRFP No. F34601–73–R–6000. Partial summary judgment will therefore be allowed to the Air Force.

## IV. PLAINTIFF'S CLAIM OF VIOLATION OF THE SERVICE CONTRACT ACT

In 1965 Congress enacted the Service Contract Act, 41 U.S.C. § 351 et. seq., as amended, to remedy the dilemma of employees of contractors and subcontractors rendering services to the Government. Such employees had not been covered by the Fair Labor Standards Act, 29 U.S.C. § 201 et. seq., or by State minimum wage laws. Because of the Government policy and legal obligation to award its contracts to the lowest responsible bidder, and because in service-oriented industries the principal business cost is wages, contractors who wished to pay employees a decent salary found it impossible to compete effectively with low-bidding offerors who paid wages at or below the subsistence level. The Government procurement policy therefore effectively depressed service industries wages.[15] The Act provided that employees must be paid at least the prevailing wages and fringe benefits for the same work in their locale. It also proscribed unsafe working conditions. However, Congress was deeply troubled

by a great number of unforeseen problems creating legislative loopholes and by faulty administration of the Act.[16] On October 9, 1972 the amendment to the 1965 Act was enacted and thereby became effective immediately. The procurement at issue here was therefore governed by the Act as amended.

As amended the Act may be described as follows. It covers

. . . [e]very contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in section 356 of this title [*inter alia,* work to be contracted out under the provisions of the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 et seq.], whether negotiated or advertised, *the principal purpose of which is to furnish services in* the United States through the use of service employees, as defined herein. . . .

41 U.S.C. § 351(a) (emphasis added). All contracts subject to the Act must contain a statement of wages and fringe benefits to be paid to service employees, whether that wage or fringe benefit has been the result of an arms-length negotiated collective bargaining agreement or a determination by the Secretary of Labor of the prevailing wages and benefits in a given locale. 41 U.S.C. § 351(a)(1), (2). The Secretary of Labor is directed to make area wage and fringe benefits determinations with re-

15. *See generally* Senate Rep. No. 798, 89th Congress, 1st Sess. (1965).

16. The Special Subcommittee on Labor to which the bill had been referred found that (1) the Department of Labor had failed to make wage and fringe benefit determinations for almost two-thirds of the contracts covered by the Act; (2) a substantial disparity in wages and fringe benefits had developed between federal wage board employees and their counterparts in the service industries; (3) the Department had not taken the existence of collective bargaining agreements into account in making its wage and fringe benefits determinations; (4) the Department had abused its discretion in administering one particular section of the Act; and

(5) contracts had been rebid yearly without new determinations or with unrealistically low determinations, creating hardships for reputable contractors and employees. *See* Senate Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., Legislative History of the Service Contract Act amendments of 1972 (Comm.Print 1902). Wage undercutting was a key legislative concern. During the hearings on the 1972 Amendments, Senator Gurney, for example, attacked service contractors who "ruthlessly and unconscionably" undercut wages and fringe benefits by bidding low on contracts against a better paying incumbent. *See* Hearings before the Subcommittee on Labor, Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess. at 12 (1972).

spect to all contracts covered by the Act "as soon as it is administratively feasible to do so." 41 U.S.C. § 358. But in any event he cannot refuse to issue a determination for any contract ending in fiscal year 1973 under the terms of which more than 25 service employees are to be employed. *Id.* Area wage and benefits determinations are essential for the enforcement of the crux of the 1972 Amendments. Section 353(c) provides for what is commonly referred to as the "successor doctrine":

> No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: *Provided,* That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.

(Emphasis in original.) Section 353(a) provides that the power of the Secretary to enforce the Act, make rules and regulations, issue orders, hold hearings, render decisions, and take other appropriate administrative action is coincident with his authority to act under the Walsh-Healey Act, 41 U.S.C. §§ 38, 39. Section 353(b) gives the Secretary apparently broad authority to determine limitations, variations, tolerances and exemptions within the statute where "necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purpose of [the Act]." [17]

Whether or not a particular Government contract is subject to the Service Contract Act is a determination ultimately to be made by the Secretary of Labor on the basis of his regulations and statutory expertise. Once made, his determination is not judicially reviewable. In Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L. Ed. 424 (1943), the Supreme Court held that it was the Secretary of Labor and not the procuring agency nor even the courts who is responsible for determining coverage under the Walsh-Healey Act, 41 U.S.C. § 35 et seq. Since the authority of the Secretary to act under the Service Contract is co-extensive with his enforcement powers under the Walsh-Healey Act, it follows naturally that here, too, his determination is final and binding. *See* Endicott Johnson Corp. v. Perkins, *supra* at 509, 63 S.Ct. at 343.[18]

---

17. *But see* Kentron Hawaii, Ltd. v. Warner, *supra,* where the court held that the Secretary had abused his exemption-creating powers under Section 353(b) in determining by regulation that contracts need not have a statement of minimum wages and benefits reflecting a wage and benefits determination if in fact no wage and benefits determination had been issued for any of the classes of employees involved at that "locality." The Air Force in this case does not seek or at least has not sought exemption status from the Secretary.

18. Nor was the District Court authorized to decide the question of coverage itself.

. . . The consequence of the action of the District Court was to disable the Secretary from rendering a complete decision on the alleged violation as Congress had directed her to do, and that decision was stated by the Act to be conclusive as to matters of fact for purposes of the award of the government contracts. Congress sought to have the procurement officers advised by the experience and discretion of the Secretary rather than of the District Court. The ASPR, 32 C.F.R. § 12.1003(c), also recognize the responsibility of the Secretary of Labor for coverage problems arising from the Service Contract Act.

The difficulty with the administration of the Act, however, is the enormity of contracts concluded by the Government and its agencies [19] and the virtual impossibility of ruling upon the applicability of the Act as to all contracts or bids submitted to the Secretary of Labor for review and advice. Therefore, the Secretary's regulations contemplate submission only when the procuring agency has made a determination that a particular contract or bid *may* be subject to the Act. The regulations require submission of an SF–98 form, detailing contract specifications, in those instances:

> Not less than 30 days prior to any invitation for bids or the commencement of negotiations for any contract exceeding $2,500 *which may be subject to the Act,* the contracting agency shall file with the Office of Government Contracts Wage Standards, Workplace Standards Administration, of the Department of Labor its notice of intention to make a service contract on Standard Form 98.

29 C.F.R. § 4.4(a) (emphasis added). The same provision appears almost verbatim in the ASPR, 32 C.F.R. § 12.-1005–2(a). Also, the introductory section to that part of the regulations dealing with application of the Service Contract Act states:

> Principles governing the application of the Act as set forth in this subpart are clarified or amplified in particular instances by illustrations and examples based on specific fact situations. Since such illustrations and examples are not intended to be exhaustive, no inference should be drawn from the fact that a subject or illustration is omitted. If doubt arises, inquiries may be directed to the Administrator of Workplace Standards . . . .

32 C.F.R. § 4.101. Not only can the procuring agency obtain an advisory opinion as to the applicability of the Act; any interested party, for example, a prospective offeror, a union certified as the collective bargaining representative for the employees of the prospective offeror, or any employee himself, may present the issue squarely to the Secretary for his determination. It should also be doubly emphasized that the mere submission of an SF–98 by the procuring agency carries no weight with the Secretary, who must use his independent judgment in deciding whether the Act applies or not. We may now turn to an examination of the relevant Air Force actions in discharging its duty under the Act and the Secretary's regulations.

It may be recalled from the Court's earlier discussion of Contract No. F34601–73–D–1444 that the contract was the product of the Air Force model contract format for jet engine overhaul and maintenance. Commencing with the effective date of the Contract Service Act in 1966, Air Force Logistics Command, DCS/Procurement and Production determined that the Act was inapplicable to such contracts. The legal office of the Air Force Logistics Command Headquarters, the Office of the Staff Judge Advocate, and the Office of General Counsel all concurred in this decision. Briefly stated, the Air Force determined that aircraft engine overhaul contracts do not have as their "principal purpose" the furnishing of services through the use of service employees within the meaning of the Act, 41 U.S.C. § 351(a). Rather, it considered such overhaul in the nature of a rebuilding or remanufacturing of the engine, requiring the furnishing of substantial material. The Air Force claims that the overhaul contracts are governed instead, therefore, by the Walsh-Healey Act, 41 U.S.C. § 35 et seq., which applies to contracts in excess of $10,000 for the manufacture or furnishing of materials, supplies, articles, and equipment. As noted before, the Service Contract Act

---

19. In Kentron Hawaii, Ltd. v. Warner, *supra,* for example, the court noted that at that time the Department of Labor was receiving some 24,000 Standard Forms 98 per year. Of these, the Secretary issued wage and benefits determinations about 40% of the time.

does not apply to contracts covered by the Walsh-Healey Act, 41 U.S.C. § 356 (2). The model contract has received wide distribution within the Air Force and industry. Apparently, plaintiff is the first to contest the inapplicability of the Service Contract Act.

■ Although the Air Force has not sought the opinion of the Secretary with regard to the specific contract at hand, there has in recent years been communication with the Secretary on the general applicability of the Act to jet engine overhaul contracts. In answer to an early inquiry, the Secretary responded on May 22, 1968:

> If the contract is to furnish a complete overhaul and rebuilt engine, as your letter states, you will be correct in your assumption that the primary purpose of the contract is not a service contract, but rather the supply of overhauled and rebuilt engines [to which the Service Contract Act does not apply] . . . However, it appears that the contract also contemplates the repairs of parts which is not an incident of the overhauling of the engines . . ., and, therefore, the Service Contract Act would cover this aspect of the work.

After a closer scrutiny of the engine overhaul contract submitted to it by the Air Force, the Secretary had this to say:

> After careful examination of the contract and discussions with the Naval Air System Command, it is our opinion that the contract in question is chiefly for the furnishing of services and subject to the Service Contract Act. Since it also involves as a significant secondary aspect the furnishing of repair parts, materials, and supplies in substantial amounts in excess of $10,000, it would also be subject to the Walsh-Healey Public Contracts Act. Coverage by the latter [A]ct does not preclude simultaneous coverage by the Service Contract Act when the principal purpose of the contract is chiefly for services, and the furnishing of the tangible items is of secondary importance.

However, the Secretary declined to issue a wage and benefits determination and advised the Air Force that the minimum wage rate would therefore be that which was set out in the Fair Labor Standards Act. Subsequently, in response to an Air Force inquiry in 1972, the Secretary did on October 13 of that year advise the Office of General Counsel, Naval Air Systems Command, that wage and benefits determinations would be made for aircraft engine overhaul and repair contracts. Accordingly, he directed the submission of SF–98 whenever such a contract was contemplated. Because the Secretary's reversal of policy regards overhaul contracts which would be performed during fiscal 1973, it was mandated by the 1972 amendments to the Act, 41 U.S.C. § 358(1).

On June 11, 1973 the Air Force wrote to the Secretary to advise him that his shift in policy would affect some 1,241 contract awards or modifications. The Secretary was told that because of the need for guidance as to the applicability of the Act to the peculiar specifications of each procurement, the Air Force was at that time at a loss to know how to proceed. It must be remembered that the Secretary had declined to issue wage and benefits determinations in the preceding years. Therefore, the Air Force announced that it planned to continue the omission of Service Contract Act statements from its contracts and solicitations unless advised otherwise by the Secretary.

On July 17, 1973 the Secretary replied as follows:

> We recognize that there are a number of complex problems in the area of "dual coverage" of the Service Contract Act and the Public Contracts Act and are presently reviewing this matter. In the meantime, however, we wish to emphasize that it continues to be the position of the Department of Labor that aircraft maintenance, repair, modification, and overhaul contracts are considered to be

contracts principally for services and thus subject to the Service Contract Act. Such contracts must contain the stipulations set forth in section 4.6 of the Regulations, 29 CFR Part 4 [relating to employee hours and compensation], and any wage determination issued under the Act in response to the required submission of an SF–98.

Plaintiff has also lodged a protest with the Comptroller General of the United States requesting a ruling on the legality of the contract in view of alleged noncompliance with the Service Contract Act.[20] The Comptroller General is also considering a similar protest by Lockheed Aircraft Service Company. He has requested the Secretary of Labor to express an opinion on the matter because of his "primary interest" in the application of the Service Contract Act.

The Court wholeheartedly agrees with the Comptroller General that coverage under the Service Contract Act ought to be determined by the Secretary of Labor. Had the Secretary issued a decision as to the particular contract at hand, the Court would have been bound to accept his conclusion. But because the Air Force has not submitted this contract for consideration by way of an SF–98, no such decision was reached. It would be strange indeed if the rule precluding judicial review of coverage determinations by the Secretary under the labor acts could be circumvented by the procuring agency through the simple expedient of ignoring its obligation under the Secretary's regulations to submit the question to him.[21] The Court therefore is of the opinion that pursuant to the doctrine of "primary jurisdiction," compulsory referral of this matter to the Secretary of Labor is warranted.[22]

This procedure has been adopted by the District of Columbia Circuit already in Wheelabrator Corp. v. Chafee, *supra*, where the court said:

> Plaintiff's application to the GAO [General Accounting Office] in June did not preclude its subsequent application to the District Court, while the matter was still pending in GAO, for

20. Curiously, the Comptroller General added that while a ruling on the Lockheed protest was expected within the near future, he would not render a decision as to the Curtiss-Wright claim because of the pendency of their present lawsuit. In Merriam v. Kunzig, *supra* at 1244, of 476 F.2d, the court suggested a reversal of deference in order to give full administrative review first:

> Possibly it will ultimately be found appropriate to impose on top of the procurement agency's procedures a rule requiring exhaustion of administrative remedies available in the General Accounting Office [which the Comptroller General heads]. Such a rule would postpone final judicial review until that agency acted on a bid protest, but might be coupled with the recognition that a federal court could preserve the status quo by a preliminary injunction in an appropriate case in the interim. [Footnote omitted.]

21. It should be emphasized that in no way whatsoever does this Court intimate any wrongdoing or bad faith on the part of Air Force personnel in determining the application of the Service Contract Act to contracts for jet engine overhaul, repair, modification or maintenance. In the earlier years of the Act, coverage under the Act

was mooted by the Secretary of Labor's nonissuance of wage and benefits determinations. The problem of dual coverage under the Service Contract Act and Walsh-Healey Act, an extremely complicated one from the viewpoint of practical administration, to say the least, is one with which the Secretary is still grappling. The Court is advised that the Secretary is preparing a final, generalized position at this time. *See* text at 774, *infra*.

22. The Court wishes to emphasize that to date the Secretary of Labor has not ruled on the specific contract at hand, even though it has ruled generally on the issue of coverage under the Service Contract Act and Walsh-Healey Act for aircraft engine overhaul contracts. It is impossible for the Secretary to give definitive, binding rulings unless he has at hand the specifications set out in the contract under examination along with the other information required by the Act and regulations in the SF–98. Therefore, the Court does not take the earlier cited letters from the Secretary of Labor as determinative in this instance, especially in view of the imminent reformulation of the Secretary's policy toward "dual coverage" problems under the Service Contract Act and Walsh-Healey Act.

injunctive relief to prevent irreparable injury from the imminent bid opening. Under the doctrine of primary jurisdiction, a court may entertain an action for permanent relief and defer its consideration of the merits until an agency "with special competence" in the field has ruled on the issues, if necessary maintaining the status quo pendente lite with injunctive relief avoiding irreparable injury pending such agency consideration.

*Id.* at 1316 of 455 F.2d.[23] In other cases the doctrine of primary jurisdiction has received solid endorsement from the Supreme Court. In United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), the Court held that the determination of freight charges from a railroad tariff required a construction of the tariff which would best be made by the ICC rather than the courts. The Court said that its decision was not simply a judicial prescription for the timetable of lawsuits, as with the exhaustion doctrine, but rather an accommodation serving the relative expertise of executive agencies.[24] *See also* Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); Whitney National Bank v. Bank of New Orleans, 379 U.S. 411, 855 S.Ct. 551, 13 L.

Ed.2d 386 (1965); United States v. Philadelphia National Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Best v. Humboldt Placer Mining Co., 371 U.S. 334, 83 S.Ct. 379, 9 L. Ed.2d 350 (1963); Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); Great Northern Railway Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); Brawner Building, Inc. v. Shehyn, 143 U.S.App.D.C. 125, 442 F.2d 847 (1971); Crain v. Blue Grass Stockyards Co., 399 F.2d 868 (6th Cir. 1968); Maddock & Miller, Inc. v. United States Lines, 365 F.2d 98 (2d Cir. 1966); Civil Aeronautics Board v. Aeromatic Travel Corp., 341 F.Supp. 1271 (E.D.N.Y. 1971); In re Penn Central Transportation Co., 329 F.Supp. 572 (E.D.Pa.1971). All of these cases indicate the willingness of the courts to assure fulfillment of the congressional intent that within its scheme of regulatory legislation certain issues of statutory construction receive at least preliminary consideration in the appropriate agency. This Court will be guided accordingly. The defendant will be directed to submit an SF–98 form for Air Force Contract No. F34601–73–D–1444 to the Secretary of Labor pursuant to the Service Contract Act, 41 U.S.C. 351 et seq. and its attendant regulations, for his consideration of coverage thereunder.[25]

---

23. The doctrine of primary jurisdiction was also apparently utilized by the district court in Merriam v. Kunzig, *supra.* The court stated that because the GAO was reviewing its lease construction practices, including the bid under protest, the court action was stayed pending administrative review. *Id.* at 1236 of 476 F.2d.

24. The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable

in the courts, and comes into play whenever the enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed with the special competence of an administrative body; in such case the judicial process is suspended pending referral of such issues to the administrative body for its views.
352 U.S. at 63–64, 77 S.Ct. at 165.

25. Ordinarily, only the LRFP and work specifications are submitted by the procuring agency to the Secretary for his consideration. Whether the Secretary wishes to accept other submissions in the form of explanatory material is a matter for his discretion. Also, the Court is informed that in some instances the Secretary does employ adversary procedures in making his ruling as to the applicability of a given labor statute. Whether such will be used here is, too, a

## V. AVAILABILITY OF INJUNCTIVE RELIEF

 The Court must now decide whether injunctive relief is available to plaintiff during the pendency of this action. The standards to be followed by a district court in deciding whether a preliminary injunction may issue under Rule 65, Fed.Rules Civ.Proc., are ably cited by Professor Moore in his treatise. They are: (1) probability of ultimate success of the suit; (2) relative importance of the rights asserted and the acts to be enjoined; (3) balancing of damage and inconvenience generally; and (4) potential for irreparable injury if injunctive relief pendente lite is denied. 7 J. Moore, Federal Practice ¶ 65.04[1] at 65–36 et seq. (3d ed. 1972). *See, e. g.*, A.L.K. Corporation v. Columbia Pictures Industries, Inc., 440 F.2d 761 (3d Cir. 1971); Hamlin Testing Laboratories, Inc. v. United States Atomic Energy Commission, 337 F.2d 221 (6th Cir. 1964); Virginia Petroleum Jobbers Association v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

 The Court agrees that owing to the position of the Secretary of Labor as evidenced by his most recent correspondence with the Air Force, there exists a possibility that plaintiff could ultimately succeed in gaining a declaration of coverage under the Service Contract Act, which, in effect, would be a declaration that the contract as presently constituted, without statements of wage and benefits as required by the Act, 41 U.S.C. § 351(a)(1), (2), is illegal on its face. Whether that possibility amounts to a probability is a close question which the Court need not decide, however, because it is convinced that preliminary injunctive relief could not in any event be granted because of the disruption it would create with the Air Force's phasing out from Curtiss-Wright and phasing in with Southwest Airmotive.

An interruption of Southwest Airmotive's build-up of production capacity, scheduled to take one full year, would mean that it would be unable to accept for overhaul and repair jet engines necessary for SAC tankers and NORAD interceptors. Unquestionably, a constant supply of overhauled engines is important to the national defense posture. True, Curtiss-Wright could continue as the incumbent until this matter is resolved if a preliminary injunction were issued. However, the very purpose of the Source Selection procurement method utilized by the Air Force for this contract was to take advantage of competition within the industry. The savings to the Air Force for a five-year contract term by awarding the contract to Southwest Airmotive rather than Curtiss-Wright may reach some $9 million. The ASPR, 32 C.F.R. § 1.300–1, recognize the importance of full competition in requiring that "[a]ll procurements, whether by formal advertising or by negotiation, shall be made on a competitive basis to the maximum practicable extent." Therefore, to grant preliminary relief and thus force the Air Force to renegotiate its contract with Curtiss-Wright would leave Curtiss-Wright in a position of disabling the integrity of the procurement procedure it seeks to vindicate. There is no reason to grant plaintiff such a windfall.

Plaintiff's application for a preliminary injunction will be denied. Summary judgment in part will be allowed the defendant as noted herein. The remainder of the case will be stayed pending a determination by the Secretary of Labor of the issues raised by plaintiff and discussed herein. The defendant will be directed to submit an SF–98 to the Secretary along with LRFP F64301–73–R–

---

matter for the Secretary to decide. While the Court recognizes that the Secretary is about to issue a general pronouncement in the area of "dual coverage" which may clarify much in dispute in the present case, the Court urges the Secretary to act as expeditiously as possible in view of the phasing aspects of this very important and very costly Air Force procurement.

6000 for his consideration in this regard. The Clerk of the Court is directed to mail a copy of this Opinion to Mr. Ben P. Robertson, Acting Administrator, Wage and Hour Division, United States Department of Labor, Washington, D. C. 20210.

Counsel may submit an appropriate order.